IN RE the MARRIAGE OF: Deborah J. ROSS,
Petitioner-Respondent,

v.

Richard J. ROSS, Appellant.

Court of Appeals

*No. 88–0990. Submitted on briefs February 6, 1989.—Decided March 23, 1989.*

(Also reported in 439 N.W.2d 639.)

For the appellant the cause was submitted on the briefs of *Mark F. Borns* and *Borns, McCaulay & Jacobson,* of Madison.

For the petitioner-respondent the cause was submitted on the brief of *Deborah Ross, pro se,* of Madison.

Before Gartzke, P.J., Dykman and Eich, JJ.

EICH, J.  Richard Ross appeals from an order denying his petition to modify the provisions of a divorce judgment which directed him to make periodic payments for the support of his former wife, Deborah Ross. The issue is whether the parties to a divorce may, consistent with the law and public policy of the State of Wisconsin, waive maintenance and, in lieu thereof, agree to a provision in the judgment for limited-term periodic spousal support payments which are not subject to modification by either party. We answer the question in the affirmative and affirm the order.

The Rosses were divorced in 1986 pursuant to a judgment which incorporated the provisions of a lengthy marital settlement agreement negotiated by the parties and their attorneys. The agreement contains a provision entitled "Section 71 Payments,"[1] which requires Richard to pay Deborah $733 per month for sixty-three months, and states that "[n]either the term nor the amount of the ... payments shall be subject to change by further agreement or Court order."[2] It con-

---

[1] The term, coined by Richard's trial attorney, who drafted the agreement, refers to Section 71(a)(1) of the Internal Revenue Code (1984), which included in a divorced woman's gross income "periodic payments ... in discharge of ... a legal obligation which, because of the marital or family relationship, is imposed on ... the husband under the decree or under a written instrument incident to such divorce or separation." As a result, the payments are deductible by the husband. The section has since been amended.

[2] The agreement does provide that the obligation would "automatically terminate" on Deborah's death, but states that "[t]his is the only contingency which can terminate the payments before the completion of the fixed term as provided herein."

cludes with the following language: "Pursuant to Wis. Stats. s. 767.32(1),[3] both parties specifically and irrevocably waive any right they may have to claim or receive maintenance payments, now and at any time in the future." (Footnote added.) The agreement also provided that its terms were to be incorporated into the judgment of divorce, and the trial court, finding the agreement to be "fair and reasonable," approved it and "incorporated [it] by reference as the judgment of this Court."

Richard eventually fell behind in the payments and filed a petition referring to the Section 71 payments as "maintenance" and requesting, among other things, that "all payments of maintenance" be suspended and "all arrearages of maintenance" be expunged. At the hearing on the petition, he testified that suspension of the payments was justified because since the divorce his income had dropped significantly, while Deborah's had increased. Richard's trial attorney—who no longer was representing him—testified as to the negotiation and execution of the marital settlement agreement, particularly the language dealing with the Section 71 payments. The court denied Richard's motion, relying on the "no-modification" terms of the agreement, and Richard appealed. Other facts will be discussed in the body of the opinion.

Richard argues first that the Section 71 payments are really payments of limited maintenance within the meaning of ch. 767, Stats., and thus are subject to modification at any time before their specified termination date. *See Dixon v. Dixon,* 107 Wis. 2d 492, 508, 319 N.W.2d 846, 854 (1982) (trial courts may modify limited maintenance payments prior to their termination date).

---

[3]Section 767.32(1), Stats., provides in part that "a judgment which waives maintenance payments for either party shall not thereafter be revised or altered in that respect ...."

His argument is, in essence, that because they walk, look and quack like maintenance payments, they can be nothing else.

We agree with Richard that divorce is a statutory procedure and that the divorce court's authority is limited to "those express and incidental powers that are conferred by statute." *Marriage of Pettygrove v. Pettygrove,* 132 Wis. 2d 456, 462, 393 N.W.2d 116, 119 (Ct. App. 1986). We also agree that no statute expressly provides for the type of "unamendable" spousal support ordered in this case and, further, that the court could not order such payments absent the parties' agreement. But the court's authority to impose an obligation on one or both of the parties without their consent is one thing, and the authority to do so upon their agreement and at their request is quite another. In the latter situation, the supreme court has had little trouble approving and enforcing divorcing parties' agreements even when those agreements transcend the provisions of the applicable statutes.

In *Marriage of Rintelman v. Rintelman,* 118 Wis. 2d 587, 348 N.W.2d 498 (1984), the court enforced a stipulated judgment for permanent, "lifetime" maintenance in the face of a statute requiring trial courts, at the payer's request, to terminate all maintenance upon the payee's remarriage. In *Bliwas v. Bliwas,* 47 Wis. 2d 635, 178 N.W.2d 35 (1970), the court enforced an agreement, also incorporated in a divorce judgment, in which the father promised to pay support until the parties' child had completed his college and postgraduate education—a period extending well beyond the time when the child would reach the age of majority. The court upheld the judgment despite the fact that the applicable statute limited the trial court's authority to

716

ordering support for "the *minor children* of the parties." *Id.* at 638 n. 1, 178 N.W.2d at 36 (emphasis in original).[4]

In each case, the court explained its ruling in terms of "estoppel"—that the payer was "estopped" from attacking the stipulated judgment. But the court's discussion makes it clear that in so stating, it was not applying the rule of estoppel developed in courts of equity over the years. Rather, it was using the term to describe the act of holding a party to his or her voluntary and knowing agreement to settle the financial aspects of a divorce action in cases where that agreement is incorporated into a judgment of the court.

Richard, apparently believing otherwise, points to the "benefit/detriment" requirements of the traditional doctrine of equitable estoppel and argues that he cannot be estopped from seeking modification of the Section 71 payments because "Deborah has not taken any action which is to her detriment[.]" We disagree.

A similar argument was made in *Rintelman*—that the husband should not be "estopped" from seeking release from his agreement to pay "lifetime support" to his former wife "because there [was] no evidence that he received any benefit [from the] agreement . . . ." *Id.,* 118 Wis. 2d at 596, 348 N.W.2d at 502. The court rejected the argument as "implausible," stating:

> It is true the record does not specifically show that the [husband] received something in return for agreeing to lifetime maintenance. However, it is undoubtedly true of many negotiated settlements that it is impossible to identify after the fact precisely what was traded for what. The [husband]

---

[4]*See also Estate of Traver,* 2 Wis. 2d 509, 87 N.W.2d 269 (1958), where the alimony provisions of a stipulated divorce decree were held to require continuation of payments even after the payer's death.

does not contend that he was coerced, misled or otherwise at a bargaining disadvantage in negotiating the stipulation. Under the circumstances it is reasonable to assume that the parties bargained as approximate equals, and that the final result was a product of give and take on both sides. Although the record does not reveal the value of the provision for lifetime maintenance in the give and take of the negotiations, it is unrealistic to assume that it had no value at all.

*Id.* at 597, 348 N.W.2d at 503 (footnote omitted). Then, noting that the parties, counsel and the trial court had all accepted and agreed to the terms of the stipulation, the supreme court concluded that the wife's understanding that the maintenance payments would continue during her lifetime was enough to "estop" the husband from requesting termination of the payments upon her subsequent remarriage. *Id.*

Finally, the *Rintelman* court held that in cases involving divorce stipulations which are intended as a "comprehensive package" for settlement of the financial aspects of the case,

all that need be shown to constitute an estoppel is that both parties entered into the stipulation freely and knowingly, that the overall settlement is fair and equitable and not illegal or against public policy, and that one party subsequently seeks to be released from the terms of the court order on the grounds that the court could not have entered the order it did without the parties' agreement. *Id.,* 118 Wis. 2d at 596, 348 N.W.2d at 502-03.

Thus, the "estoppel" rule of *Rintelman* and *Bliwas* is not one based on the historic elements of the equitable doctrine. It is simply a rule of law which holds the parties to the terms of a stipulated divorce

judgment in cases where the stipulation is fair and not violative of public policy, and where, but for the parties' agreement, the court could not have entered the judgment it did. So viewed, the trial court's decision to apply or not to apply the rule is not, as in cases of "true" equitable estoppel, a discretionary determination. *See Production Cr. Ass'n v. Jacobson,* 131 Wis. 2d 550, 555, 388 N.W.2d 655, 657 (Ct. App. 1986). Rather, it is a determination that the particular facts of the case meet the general legal standards of fairness and voluntariness, and, further, that the agreement does not contravene the public policy of the state as expressed in its statutory and court-made laws. And those are questions of law, which we review *de novo,* without deference to the decision of the trial court. *Hennekens v. River Falls Pol. & Fire Comm.,* 124 Wis. 2d 413, 424, 369 N.W.2d 670, 676 (1985).

Applying those rules to this case, we note first that the Ross's marital settlement agreement was indeed a "comprehensive" settlement of their financial affairs. The document is twenty-seven pages long—with more than ten pages devoted specifically to the financial aspects of the divorce—and it was the result of extensive discussion and negotiation among counsel and the parties. It covers everything from payment of minor household debts to division of the parties' property, and from the tax impact of the various provisions to built-in protection against possible future bankruptcies. Second, the trial court found the agreement to be both fair and equitable, and Richard does not challenge that finding. Indeed, he stated at trial that he believed it to be fair and reasonable and that he had no "reservations" about it.

We also believe that Richard "freely and knowingly" assented to the agreement. His trial attorney testified that he went over the agreement "item by item" with Richard, and that he [Richard] was "very much involved in the [negotiating] process . . . ." Nor are we persuaded by Richard's argument that, given the intervening financial setbacks to which he testified at the hearing, enforcement of the agreement would be "unconscionable." Rather, we agree with the trial court, who recognized that the agreement was the result of "give and take" on both sides:

> [T]here really was consideration given to each party and each party was also losing something. It's a calculated risk, it's a gamble that each party took. Unfortunately for Mr. Ross . . . the gamble has not worked . . . to his advantage . . . . That's true in business as well as in family matters and the dice [have not] roll[ed] his way in this situation . . . . [But it] could cut . . . the other way. It could be that Ms. Ross is in desp[a]rate need of help and Mr. Ross is making a fortune and she would not . . . be able to come back to this Court and ask . . . me to continue the payments or increase [them], and it gives benefits to both parties in terms of its tax impact, and . . . permits settlement of cases that would not otherwise be settled.

Finally, we are satisfied that enforcement of the agreement does not contravene the law or public policy of Wisconsin any more than did the agreements in *Rintelman* or *Bliwas*. As we have said, we have little doubt that the court, on its own or over the parties' objections, would lack the power to order such payments. But with the parties' agreement and at their request, judgments may include provisions that the court could not otherwise enforce. *Rintelman,* 118 Wis.

720

2d at 593–94, 348 N.W.2d at 501; *Bliwas,* 47 Wis. 2d at 638–39, 178 N.W.2d at 37. We see no difference in law, policy or principle between an agreement waiving statutory maintenance and providing instead for limited-term periodic spousal support payments not subject to the restrictions the legislature has placed on traditional maintenance awards, and one extending support beyond the child's majority or maintenance beyond the wife's remarriage, or even the payer's death. We conclude, therefore, that the trial court properly dismissed Richard's petition.

*By the Court.*—Order affirmed.