IN RE the MARRIAGE OF:

Janice KRIEMAN, Petitioner-Respondent,†

v.

Mark A. GOLDBERG, Respondent-Appellant.

Court of Appeals

*No. 96–3489. Submitted on briefs August 29, 1997.—Decided October 8, 1997.*

(Also reported in 571 N.W.2d 425.)

†Petition to review denied.

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Richard J. Podell* of *Richard J. Podell & Associates, S.C.* of Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Wallace K. McDonell* of

*Allen, Harrison, Williams, McDonell & Swatek* of Whitewater.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

SNYDER, P.J. Mark A. Goldberg appeals from a trial court order finding him in contempt for failure to pay child support as required by a prior stipulation agreement and from an order denying his motion to revise his child support obligations. Goldberg claims that the trial court erred because: (1) it found him in contempt when he did not intentionally fail to make child support payments after he lost his job; (2) it issued a punitive sanction for a remedial contempt order which he did not have the ability to purge; and (3) as a matter of public policy he should not be estopped by a stipulation agreement from requesting a modification of his child support obligations.

We agree that the trial court's use of its contempt power in this instance was a misuse of discretion because Goldberg's failure to pay the agreed-upon child support was not intentional. We also conclude that because the stipulation agreement was absolute, as a matter of public policy Goldberg is not estopped from seeking a modification of his support obligations due to his changed financial circumstances. The stipulation required him to pay a certain amount of child support, regardless of his income, without any stated time limitation to provide an opportunity for reevaluation. We therefore reverse and remand for further proceedings.

Goldberg and Janice Krieman were married in 1976. They were divorced in 1987 and custody of their four children went to Krieman. It is apparent from the record in this case that various postdivorce issues have been the subject of litigation; much of the litigation has

pertained to the level of child support Goldberg is required to pay.[1] Although the parties were married in Illinois and resided there until after their divorce, at the time of this action Goldberg was living in Florida and Krieman was residing in Wisconsin with their children.[2]

On November 1, 1995, after protracted litigation over Goldberg's support obligations, the trial court signed an order based on the parties' stipulation in which Goldberg and Krieman agreed to the following terms:

1. [Mark Goldberg's] child support payment to Janice Krieman shall be $31,200.00 per year, payable in the amount of $1,300.00 on the 1st of the month and $1,300.00 on the 15th of the month, commencing November 1, 1995, and continuing until Ross Goldberg reaches age 18 on August 16, 1996. Thereafter, respondent's child support shall be reduced to $28,000.00 per year . . . .
2. [Mark Goldberg's] child support obligation shall remain the same regardless of his income.

. . . .

4. The parties agree that [Mark Goldberg's] income fluctuates on a monthly and yearly

---

[1] In January 1995, a family court commissioner concluded that Goldberg was improperly diverting income to his second wife's credit (she worked as his administrative assistant) in order to lessen his support obligations. The commissioner reallocated the Goldbergs' income for child support purposes and ultimately computed arrearages of $61,696.10 for a four-year period. The parties subsequently settled and Goldberg paid $40,000 plus attorney's fees.

[2] The oldest child was born on August 16, 1978; triplets were born on December 5, 1981.

basis. They further agree that $100,000 per year is an accurate estimate of the respondent's income and that the child support amounts agreed to herein are, therefore, in conformity with the percentage standards established by [DHSS] in Wis. Stats. 46.25(9).

5. The parties further agree that [Mark Goldberg's] earning capacity is approximately $100,000 per year, but that he has the potential to earn substantially more or substantially less than said amount. The parties agree that it is in the best interests of the children and both parties that the child support amount agreed to herein be established as the final modification of child support herein. They agree that regardless of [Mark Goldberg's] future income, the child support level shall remain the same. Therefore, neither party shall under any circumstances have the right to petition the court for a modification of the child support provided for herein.

At the time the stipulation was entered into, Goldberg was employed as a telemarketer for Best Marketing. Subsequent to the above order, Goldberg made timely and appropriate payments until August 15, 1996.

In July 1996 the Federal Trade Commission (FTC) filed charges against several telemarketing companies and secured a permanent injunction against Best Marketing, shutting down the business for "deceptive acts or practices." Goldberg lost his job and, due to the circumstances of the injunction, was limited in his ability to obtain another telemarketing position.[3] He eventu-

---

[3] According to Goldberg's testimony, he was advised by legal counsel not to seek another telemarketing job while the FTC was conducting its investigation. He testified that his

ally obtained a sales position in men's wear earning a salary of $13,000 annually.

Goldberg made substantially reduced payments to Krieman beginning August 15, 1996, and continued to make timely but reduced payments thereafter. On September 18, Krieman filed a Motion for Remedial Contempt. At the motion hearing, the trial court looked at the combined income of Goldberg and his second wife for 1995 and 1996 and concluded that "[s]ince he already . . . made that money [$175,000 in 1995 and $100,000 in 1996] there is no way that he can claim here that he didn't have the ability to pay the support. . . . [The support calculations] were based on $100,000.00 a year, and he's already exceeded that figure." The trial court found that Goldberg had intentionally failed to pay child support and ordered him committed to the county jail for six months.

In order to purge the contempt order, Goldberg was required to pay an arrearage of $6298, currently due payments of $1166.67 on the first and fifteenth of the month, and attorney's fees. The trial court also denied Goldberg's motion to revise his child support payments, finding that the earlier stipulation of the parties was entered into "freely and knowingly" and that based on the terms of the stipulation Goldberg could not "attempt to modify the child support contrary to the agreement." The trial court subsequently denied Goldberg's motions for reconsideration and to stay the contempt sanctions. Goldberg now appeals.

---

earning capacity in telemarketing was much higher than what he could earn for other sales commission work.

.

*Contempt Order*

■■■

We review a trial court's use of its contempt power to determine whether the court properly exercised its discretion. *See Haeuser v. Haeuser,* 200 Wis. 2d 750, 767, 548 N.W.2d 535, 543 (Ct. App. 1996). A person may be held in contempt if he or she refuses to abide by an order made by a competent court. *See id.* at 767, 548 N.W.2d at 542. In the case of a remedial sanction, compliance with the purge provision must be in the power of the contemnor. *See State ex rel. N.A. v. G.S.,* 156 Wis. 2d 338, 343, 456 N.W.2d 867, 869 (Ct. App. 1990). The principal findings that a court must make are that "the person is able to pay and the refusal to pay is willful and with intent to avoid payment." *Haeuser,* 200 Wis. 2d at 767, 548 N.W.2d at 543.

In this instance, the court's finding of contempt rests on its factual finding regarding Goldberg's ability to pay. Before issuing the contempt order, the trial court made factual findings that: (1) Goldberg had failed to pay $6298 in child support in 1996; (2) in 1996, up to July, Goldberg earned $100,000 in his telemarketing job; (3) that income was the base line set in the stipulation and "he cannot now claim that he is unable to pay the child support ordered pursuant to the stipulation"; and (4) Goldberg's failure to pay support was willful and intentional as "he has not shown that he was unable to pay the support."

■■■

This court will not set aside a trial court's findings of fact unless they are clearly erroneous. *See id.; see also* § 805.17(2), STATS. However, based on the following, we conclude that the trial court misapplied the law when it found that Goldberg's failure to pay support was willful and intentional. Goldberg testified that the

169

FTC closed his employer on July 17, 1996 and that he did not have any notice or knowledge that this would occur. This fact was uncontested by Krieman. He also testified that the $100,000 earned for the first eight months of 1996 was a combined household income and included his wife's earnings. Goldberg also gave detailed testimony as to the disposition of those earnings.

Goldberg testified that his wife's income in 1996 accounted for approximately $22,200 of their combined income.[4] It was not disputed that Goldberg had already paid approximately $17,200 in child support in 1996 and $1000 per month in health insurance and medical bills. According to Goldberg's testimony, his tax liability for this time period was approximately $35,000.

Calculations using these figures show that Goldberg retained between $14,000 and $18,000 for his own living expenses during the first eight months of 1996.[5] Even using the higher figure, Goldberg then had approximately $2700 per month for living expenses, or

[4] At the time the stipulation agreement was reached, the trial court had determined that $31,200 of the Goldbergs' combined income was attributable to his wife. Although there was some disagreement as to the precise figure (Krieman's counsel argued that $18,200 of the income that Goldberg reported as their combined income was attributable to Goldberg's wife in 1996), for purposes of our analysis of the appellate issue this difference is immaterial.

[5] This is based on the following calculations, using round numbers. The Goldbergs' combined income for the first eight months of 1996 was $100,000. Subtracting the tax liability leaves $65,000. We next deduct the amount of child support Goldberg had already paid in 1996—$17,000—as well as the $1000 per month he paid in medical expenses, and the total left is $36,000. However, these calculations have not yet deducted that portion of his income attributable to his wife. If the smaller

slightly more than the amount he was contributing each month for child support—$2600.[6]

In mid-July, this income was cut off when the FTC closed the telemarketing business that employed both Goldbergs. The trial court's determination that Goldberg's failure to pay support was willful and that "he has not shown that he was unable to pay the support" is not supported by the facts of record. The trial court's analysis of this issue erroneously opines that because Goldberg had already earned the threshold figure of $100,000 in the first eight months of 1996, he had to have set aside the amount required to satisfy his child support obligations for the entire year. First, this finding fails to take into account the fact that a portion of the threshold income was attributable to his wife and was unavailable to satisfy support obligations. *See Abitz v. Abitz,* 155 Wis. 2d 161, 164, 455 N.W.2d 609, 610 (1990). Second, this analysis also suggests that Goldberg was required to save and put aside money to meet his child support obligations; this was not required in the stipulation agreement. The trial court's reasoning also ignores the effect of a sudden and unexpected job loss, particularly the loss of such a high-paying position. We conclude that the trial court misused its discretion when it found that Goldberg's failure to pay was willful and intentional and therefore

income figure is attributed to her—$18,000—that leaves a total of $18,000 for Goldberg's living expenses.

[6] This figure is based on his support for all four children. As of August 16, 1996, when his oldest child turned eighteen, the stipulation agreement required that Goldberg pay $1166.67 on the first and fifteenth of each month. This does not include any medical payments Goldberg might be obligated to pay.

reverse the trial court order finding Goldberg in contempt.[7]

Krieman responds, however, that Goldberg's actions were similar to those of the payor in *Van Offeren v. Van Offeren,* 173 Wis. 2d 482, 496 N.W.2d 660 (Ct. App. 1992), who quit a well-paying job and attempted to start his own business. The new business did not generate sufficient income for him to pay his support obligations and he fell behind. *See id.* at 490, 496 N.W.2d at 662. The court held that the payor's voluntary pursuit of a business with no immediate prospect of earning an income adequate to meet his support obligations would support a finding of contempt. *See id.* at 499, 496 N.W.2d at 666.

We disagree that Goldberg's circumstances are analogous. Goldberg's employer was unexpectedly closed down, leaving Goldberg without a source of income. The circumstances of his loss of income were completely out of his control. We are not persuaded that the rule of *Van Offeren* is applicable to these facts.

### *Modification of the Child Support Order*

At the same hearing where the trial court found Goldberg in contempt for his failure to pay child support as required by the stipulation agreement, it also considered Goldberg's motion requesting modification of his child support obligations due to changed circumstances. Krieman argued that Goldberg was estopped from requesting modification by the stipulation agreement the court had ordered the previous November.

---

[7] Goldberg's second issue, whether the trial court issued a punitive sanction for remedial contempt, is moot in light of the above conclusion and will not be addressed. *See State ex rel. Wis. Envtl. Decade v. Joint Comm.,* 73 Wis. 2d 234, 236, 243 N.W.2d 497, 498 (1976).

The trial court agreed with Krieman, finding that because both parties had entered into the agreement "freely and knowingly" and that Goldberg had agreed "not to come in and attempt to modify the child support order" he was now estopped from making a request for modification in spite of his changed financial circumstances.

Resolution of this issue requires us to construe the stipulation agreement between the parties. The construction of a written contract is a question of law. *See Levy v. Levy,* 130 Wis. 2d 523, 528, 388 N.W.2d 170, 172 (1986). We determine questions of law independently, with no deference to the conclusions of the trial court. *See id.* at 529, 388 N.W.2d at 172–73.

The trial court retains jurisdiction to modify a divorce judgment providing for child support. *See* § 767.32(1), STATS. Although a trial court is prohibited from modifying a waiver of spousal maintenance or a final division of property, this prohibition does not exist for child support. *See Ondrasek v. Tenneson,* 158 Wis. 2d 690, 695, 462 N.W.2d 915, 917 (Ct. App. 1990). This policy recognizes the importance of the best interests of the child when support issues are considered and allows a court to modify an earlier award when there is a change in circumstances unforeseen at the time the divorce judgment was entered. *See id.*

Krieman, however, argues that Goldberg is estopped from seeking a modification of his obligations because of the stipulation agreement. She claims that "a child support agreement with a floor provision has been specifically approved in the *Honore v. Honore* case, 149 Wis. 2d 512, 439 N.W.2d 827 (Ct. App. 1989)." There, we held that the father was estopped from requesting a reduction in his child support obligations.

*See Honore v. Honore,* 149 Wis. 2d 512, 518, 439 N.W.2d 827, 829 (Ct. App. 1989). To invoke estoppel in the instant case, Krieman must show that both she and Goldberg entered into the stipulation freely and knowingly, that the settlement was fair and equitable and not illegal or against public policy, and that Goldberg seeks to be released from the agreement's terms on the grounds that the court could not have entered the order it did without their agreement. *See Ondrasek,* 158 Wis. 2d at 694–95, 462 N.W.2d at 917.

We conclude that the dispositive portion of Krieman's estoppel claim lies in whether enforcement of the parties' stipulation agreement violates public policy. The trial court found that the parties entered into the agreement freely and knowingly. At the time the agreement was reached, both parties, represented by counsel, agreed that it was just and equitable and that it was done "to resolve a long-term disagreement of the parties concerning child support." The facts of record support the trial court's findings as to these aspects of the estoppel claim, but the trial court did not specifically address the public policy issue of whether an agreement with language that absolutely prohibits the modification of child support under any circumstances offends public policy.[8]

Krieman claims that the public policy issue was considered in *Honore* when this court considered the question of "whether a party to a divorce may stipulate to maintaining a certain level of child support notwithstanding a subsequent reduction in the party's income." *Honore,* 149 Wis. 2d at 513, 439 N.W.2d at 827. The parties' agreement stated that the payor

---

[8] The trial court stated in its findings, "[T]he overall settlement was fair and equitable and not illegal or against public policy."

father had agreed to "maintain this level of support [$700 monthly], notwithstanding a reduction in his income or other financial factors *at least until the youngest child . . . is in first grade, or until September 1, 1989." Id.* at 514, 439 N.W.2d at 827 (emphasis added). We concluded that such a stipulation was not contrary to public policy. *See id.* at 513, 439 N.W.2d at 827.

However, that stipulation differs from the Krieman-Goldberg stipulation in one significant respect. The stipulation in *Honore* included a point in time at which the stipulated payment could be reviewed and adjusted based on a change of circumstances. Thus, the payor spouse in that case was bound to a certain level of payment for a time certain, at which point he could request a reevaluation. In the instant case, the agreement as written contained no such provision.[9] Because the agreement in the instant

[9] We recognize that all child support arrangements have a finite limit inherent in them due to the fact that ordinary support runs until the eighteenth or nineteenth birthday of the child. However, the arrangement in *Honore v. Honore,* 149 Wis. 2d 512, 439 N.W.2d 827 (Ct. App. 1989), included not only a date certain at which time the arrangement could be reexamined, but also stated that this is tied to the point in time when the youngest child is presumed to begin first grade. Thus, the agreement incorporated a point in time when it would be logical to reexamine both parents' financial circumstances.

Our analysis is further supported by the decision of another court which considered this issue. In *Nicholson v. Combs,* 650 A.2d 55 (Pa. Super. Ct. 1994), the court upheld a nonmodifiable three-year freeze on child support, but noted that "[the parties] bargained for nonmodifiability *for a specified limited period of time." Id.* at 58 (emphasis added).

The Pennsylvania Supreme Court subsequently reviewed this case. *See Nicholson v. Combs*, No. 03970PHL92, 1997 WL 706533 (Pa. Nov. 14, 1997). It noted that the payor was subject

case contains no time-limiting language, we are not bound by our conclusion in *Honore*. We therefore consider whether this particular stipulation offends public policy.

The other side of this issue was considered by this court in *Ondrasek,* 158 Wis. 2d at 692, 462 N.W.2d at 916, in which we held that "a divorce stipulation that waives or sets a ceiling on child support and prevents modification of child support offends public policy." We concluded that "if a waiver or 'ceiling' of the entire child support obligation is deemed unmodifiable, the needs of a child could be left unsatisfied." *Id.* at 696, 462 N.W.2d at 918. The underpinnings of this policy are a recognition that even if a stipulation is fair when it is created, it may not be fair in the future. *See id.* Although the *Ondrasek* decision focused on the best interests of the child and was concerned with a modification in favor of a payee, in this instance we consider the public policy of requiring a payor who has stipulated to a certain base rate of support to absolutely continue that payment level regardless of any change in circumstances. It is necessary to consider the equitable nature of estoppel.

---

to both the contractual support agreement and a support order entered by the family court (which order could be enforced through contempt proceedings). Based on that, the court concluded that if the payee sought redress in family court, it was within the power of the court to determine that a payor's inability to pay allowed for a downward modification of support obligations. *See id.* at 10. However, such a modification would *not* preclude a payee from suing on the contractual support agreement and a court sitting in law or equity from making a determination that the terms of the contract were enforceable. *See id.* at 11.

In *Nichols v. Nichols,* 162 Wis. 2d 96, 469 N.W.2d 619 (1991), the supreme court considered the question of whether a stipulation in a divorce judgment that maintenance was not subject to modification could be upheld. In considering whether this provision violated public policy, the court stated, "The doctrine of estoppel set forth in *Rintelman* is equitable only if it applies to both payors and payees of maintenance." *Nichols,* 162 Wis. 2d at 114, 469 N.W.2d at 626. "If payees may seek modification of nonmodifiable maintenance due to financial setbacks suffered since the divorce, but payors of maintenance may not do the same, the payor is denied the benefit of his or her bargain, while the payee receives the benefit of his or her bargain without risking the effects of what he or she agreed to in the stipulation." *Id.* (footnote omitted).

While the *Nichols* case concerned maintenance payments in a divorce action, we conclude that the reasoning is analogous when applied to the case at bar. *Ondrasek* stands for the proposition that the best interests of the child are served through a policy which does not preclude a payee from seeking a modification in child support because of a change of circumstances, even though the parties had stipulated to a nonmodifiable amount of support. However, as suggested by the analysis of *Nichols,* such a position is only fair if it is applied equitably to both sides.

██

Pursuant to *Ondrasek,* Krieman retains the ability, in spite of the stipulation agreement, to come back to the court and request a modification of the support agreement if there is a change in circumstances and the best interests of the children require a modification of the payment. To prohibit the payor parent from exercising the same right ignores the reality that the

supporting parent's financial circumstances may change dramatically for reasons beyond the payor's control. A stipulation that purports to make child support nonmodifiable and is unlimited as to time could impoverish the payor parent and place him or her in financial jeopardy. A court must consider the vagaries of life and the reality that a specific circumstance may require an adjustment of an agreed-upon level of support, even where the parties have entered into a stipulation agreement. To hold otherwise and subject a payor parent to an unreviewable stipulation for child support could jeopardize a payor parent's financial future, may have detrimental effects on the parent/child relationship and in this way would ultimately not serve the best interests of the child. This case presents a compelling change in a payor parent's ability to pay child support. We conclude that the absolute stipulation agreement, with no time limitation or opportunity for review, is against public policy. Goldberg is not estopped by the stipulation from seeking a modification of his support obligations due to a material change in circumstances.

We conclude that the trial court's contempt order was a misuse of discretion where it failed to recognize that Goldberg's failure to pay the agreed-upon support was not willful, but rather due to the FTC shutting down his employer. Additionally, as a matter of public policy, no party can bind himself or herself to an absolute stipulation as to child support with no time-limiting language. This ignores reality and the possibility of a chain of events beyond the control of the payor. We therefore remand the cause for further consideration of these issues.

*By the Court.*—Orders reversed and cause remanded.