IN RE the MARRIAGE OF:

Jane A. PATRICKUS, Petitioner-Appellant,†

v.

Robert PATRICKUS, Respondent-Respondent.

Court of Appeals

*No. 99–3315. Submitted on briefs July 17, 2000.—Decided September 19, 2000.*

## 2000 WI App 255

(Also reported in 620 N.W.2d 205.)

†Petition to review denied.

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Nicholas C. Zales* of *Zales Law Office* of Milwaukee.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Mark A. Warpinski* of *Warpinski & Vande Castle, S.C.* of Green Bay.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1.  CANE, C.J.   Jane Patrickus appeals orders modifying her former husband's maintenance obligation to a sum not less than $2,500 per month. She argues that her former husband, Robert Patrickus, is equitably estopped from seeking a maintenance modification. She further argues that the trial court's finding of changed financial circumstances is based upon mistakes of fact and Robert's voluntary income reduction. We conclude that public policy considerations preclude the application of the estoppel doctrine. We further conclude that the record supports the trial court's determination that a substantial change in circum-

stances justifies reduced maintenance payments. Accordingly, we affirm the orders.

¶ 2.　Jane and Robert were divorced in 1995 after thirty-four years of marriage. During their marriage, Jane worked as a homemaker and Robert was employed as a certified public accountant. In 1995, he earned approximately $109,000. At the time of their divorce, Jane and Robert entered into a comprehensive marital settlement agreement that was approved by the trial court and incorporated into the divorce judgment. It provided Jane a maintenance payment for an indefinite period modifiable annually, provided the amount would be not less than the greater of one-half of the net profit of Robert's accounting practice or $4,375 per month, unless Robert became permanently disabled or Jane cohabited or remarried.[1]

---

[1] The agreement provides:

Husband shall pay maintenance to Wife of $4,375 per month for an indefinite period, which said maintenance shall be modifiable only as follows: annually, as to amount, on the anniversary date of the parties' divorce, provided that the amount set for maintenance shall be not less than the greater of one-half of the net profit (defined as gross income less ordinary and necessary business expenses, as defined in IRC § 162) of Husband's accounting practice per year for the prior twelve months (divided by twelve and payable monthly for the next twelve months) or $4,375 per month; provided, however that if Husband becomes permanently disabled, maintenance may be modified to reflect such change of circumstances and Wife shall receive as maintenance at least one-half of Husband's disability payments (Husband shall continue, maintain, and pay the premiums for his policy(ies) of disability insurance); and further provided that if Wife cohabits without marriage, the maintenance amount shall be reduced to one-half of the amount otherwise payable. Further, the Court shall reserve jurisdiction over the issue of maintenance for Wife. . . . In any event, all maintenance under this Agreement ceases upon the death of the Wife.

Further, Husband shall, as additional maintenance, pay the premium for, continue and maintain Wife's health insurance cover-

¶ 3. In 1998, Robert moved to modify maintenance based upon a reduction in his income. At the motion hearing, Robert testified that he was fifty-eight years old and was a licensed certified public accountant since 1972. Except for a short time, he had operated as a sole proprietor. He employed two certified public accountants, one in his mid-forties and the other in his early thirties. Robert testified that both had been looking for other employment. Robert explained that he agreed to incorporate in order to eventually transfer an interest in his practice to keep them from leaving and to prevent a downward spiral of his practice.[2] He had lost employees previously, making it difficult to get

age until the earlier of her death or remarriage, and shall furnish Wife evidence of coverage upon request.

In the event of remarriage, maintenance, deductible by Husband and includable by Wife, shall be continued for such period and in such amounts as is required to pay in full and satisfy the first mortgage on the residence awarded to Wife hereunder, pursuant to the terms of such mortgage note, as well as any liens against the said residence created during the marriage or as a result of debt(s) incurred during the marriage, which said maintenance shall be non-modifiable in all respects; provided, however, that in the event Wife sells the residence at any time and receives net proceeds (after mortgage, liens, and costs of sale) exceeding $200,000, one-half of the amount of any principal reduction on the residence awarded to Wife hereunder (but not more than one-half of the excess net proceeds of the sale of the residence), effected by Husband on such debts and mortgage after a remarriage by Wife, shall be credited to Husband out of Wife's share of the net proceeds of the sale of Husband's accounting practice, as hereinafter provided. Further, jurisdiction over maintenance for Wife is reserved for the life of Wife, regardless of any future remarriage by her, to assure that Husband pays any and all obligations assigned to him hereunder.

Indefinite maintenance is awarded based upon the length of the parties' marriage, Wife's contributions as a homemaker and child care provider, her absence from the job market.

[2] Jane receives a share of the proceeds of any transfer of the business as part of the property division.

work out and did not want to go through the cost of training new personnel.

¶ 4. The trial court rejected Jane's allegation that Robert had intentionally hidden or reduced income to avoid his maintenance obligation. The court believed Robert's testimony that he had made reasonable business decisions to prevent the downward spiral of his business and to retain key employees. The trial court concluded that the parties' marital settlement agreement, incorporated into their divorce decree, was unfair because it permitted Jane to seek increases in maintenance for an indefinite time period while providing no mechanism for Robert to seek a reduction. The court concluded that for reasons of public policy, equitable estoppel raised no bar to Robert's motion for maintenance modification.

¶ 5. The court further determined that pursuant to WIS. STAT. § 767.32,[3] Robert demonstrated a substantial change in financial circumstances. The court granted his motion and ordered Robert to pay one-half of his earned income but not less than $2,500 per month maintenance. It also ordered Robert to provide monthly income and expense statements from his accounting firm and a list of accounts receivables. Jane appeals the order.

1. EQUITABLE ESTOPPEL

¶ 6. Jane argues that the trial court erroneously failed to apply the doctrine of equitable estoppel to bar Robert from seeking a modification of maintenance. We disagree. "The decision to apply or not to apply the

---

[3] All statutory references are to the 1997–98 version unless otherwise noted.

doctrine of estoppel set forth in *Rintelman* [*v. Rintelman*, 118 Wis. 2d 587, 348 N.W.2d 498 (1984)] to an undisputed set of facts is a question of law." *Nichols v. Nichols*, 162 Wis. 2d 96, 103, 469 N.W.2d 619 (1991). We review questions of law de novo. *See id.*

¶ 7. Generally, maintenance obligations may be modified based upon a substantial change in circumstances. *See* WIS. STAT. § 767.32. In certain cases, however, a party may be estopped from seeking a modification of maintenance. "[T]he 'estoppel' rule of *Rintelman* . . . is not one based on the historic elements of the equitable [estoppel] doctrine." *Ross v. Ross*, 149 Wis. 2d 713, 718, 439 N.W.2d 639 (Ct. App. 1989). "It is simply a rule of law which holds the parties to the terms of a stipulated divorce judgment in cases where the stipulation is fair and not violative of public policy, and where, but for the parties' agreement, the court could not have entered the judgment it did." *Id.* at 718–19. It reflects the notion that a person who agrees that something be included in a family court order, especially where he receives a benefit, is in a poor position to subsequently object to the court doing as he requested. *See Rintelman*, 118 Wis. 2d at 595–56.

¶ 8. A party may be equitably estopped from seeking modification of the terms of a maintenance stipulation incorporated into a divorce judgment if

> both parties entered into the stipulation freely and knowingly, . . . the overall settlement is fair and equitable and not illegal or against public policy, and . . . one party subsequently seeks to be released from the terms of the court order on the grounds that the court could not have entered the order it did without the parties' agreement.

348

*Nichols*, 162 Wis. 2d at 104.[4]

¶ 9.  In *Ross*, we employed the estoppel doctrine to prevent the modification of payments under 26 U.S.C. § 71, which are created by the tax code permitting nonmodifiable limited term periodic spousal support. The parties' stipulation provided for maintenance of $733 per month for sixty-three months. We observed that stipulating to a nonmodifiable maintenance provision is a calculated risk that could well have turned out to the disadvantage of either party. *See id.* at 720. We concluded that the agreement did not contravene public policy and, because the four conditions outlined in *Rintelman* were met, the trial court properly denied relief.

¶ 10.  Again, in *Nichols*, our supreme court applied the estoppel doctrine to prohibit the payee spouse from requesting a modification of the amount of maintenance when the parties' stipulation prohibited the modification. *See id.* at 106–07. The stipulated divorce judgment provided that the former husband pay a certain sum "to be considered as permanent and in lieu of any further or additional maintenance pay-

[4] *Rintelman* distinguished stipulations that are incorporated into a judgment from stipulations to which the circuit court merely refers and approves. If merely approved, "[t]he arrangement is contractual, not a judicial determination, and therefore no more subject to change by the court than the terms of any other private agreement." *Rintelman v. Rintelman*, 118 Wis. 2d 587, 592–93, 348 N.W.2d 498 (1984) (quoting *Miner v. Miner*, 10 Wis. 2d 438, 444, 103 N.W.2d 4 (1960)). However, "where the court adopts the parties' stipulation and incorporates it into its judgment, '[t]he award [is] . . . by adjudication and subject to modification.' " *Id.*

ments," except that it would terminate upon the wife's remarriage. *See id.* at 101. The court recognized "that enforcing provisions which provide that maintenance is not subject to modification may result in financial hardship." *Id.* at 115. Nonetheless, a stipulation that was fair and reasonable under the circumstances existing at the time of the divorce hearing is not unfair or against public policy simply because it may result in subsequent financial hardship. *See id.* at 115–16. Accordingly, a stipulated divorce judgment that provides that the amount of maintenance cannot be modified is not against public policy. *See id.* at 108.

■

¶ 11. "We determine whether a stipulation is fair, equitable, and not against public policy by taking into account the circumstances which existed at the time the stipulation was incorporated into the divorce judgment." *Id.* "[W]e examine the settlement *as a whole.*" *Id.* at 111. In evaluating public policy considerations, the *Nichols* court noted that fairness requires both payors and payees of maintenance to bear the risks of future financial setbacks. It concluded that allowing the payee spouse to seek relief from the stipulation would not be fair because a payor spouse could not seek relief from nonmodifiable maintenance on the ground of financial hardship arising after the divorce. *See id.* at 111. *Nichols* noted that applying the doctrine of equitable estoppel was consistent with the public policy of this state to encourage settlement of divorce cases and promote finality. *See id.* at 115.

■

¶ 12. Applying these principles, we conclude that the trial court did not err by deciding that equitable estoppel did not bar Robert's motion for modification. The parties do not dispute that two of *Rintelman*'s con-

ditions for estoppel have been satisfied: (1) the parties entered into a comprehensive marital settlement freely and knowingly that was approved by the trial court and incorporated into the divorce judgment, and (2) the court would not have had the power to enter the settlement absent the parties' agreement. Therefore, the only remaining condition is whether their stipulation, at the time it was entered into, violated public policy because it burdened only one party with the entire risk of financial hardship indefinitely.

¶ 13. We conclude that under the rationale employed by our supreme court in *Nichols*, the one-sided indefinite maintenance modification stipulation must be voided on public policy grounds.

> The doctrine of estoppel set forth in *Rintelman* is equitable only if it applies to both payors and payees of maintenance. If payees may seek modification of nonmodifiable maintenance due to financial setbacks suffered since the divorce, but payors of maintenance may not do the same, the payor is denied the benefit of his or her bargain, while the payee receives the benefit of his or her bargain without risking the effects of what he or she agreed to in the stipulation.

*Id.* at 114.

■

¶ 14. While *Nichols* is not directly on point, its public policy rationale applies. We conclude that it violates basic fairness for Jane to be entitled to the perpetual benefit of increases in Robert's income, without sharing in the risk occasioned by a reversal of his good fortune. And, unlike an order that specifies a nonmodifiable fixed amount or term of maintenance, the present one-sided maintenance modification provision invites inevitable litigation. *Nichols* observed that

"[t]he advantage of agreements providing that maintenance is not subject to modification is certainty and finality." *Id.* at 115. Here, that advantage is not served because the maintenance provision is perpetually modifiable by one of the parties. The stipulated provision fails to advance the public policy of resolving disputes without costly litigation. We agree with the trial court that the one-sided indefinite modification provision fails to accomplish goals of fairness and finality and must be voided on public policy grounds.

¶ 15. Jane offers no case law to support the proposition that a one-sided modification provision for an indefinite term could be consistent with public policy.[5] Jane asserts, however, that the failure to apply estop-

---

[5] Jane agrees that one-sided modification provisions have been disfavored in child support cases. *See Krieman v. Goldberg*, 214 Wis. 2d 163, 176–78, 571 N.W.2d 425 (Ct. App. 1997). We acknowledged that an agreed upon, time-limited floor for child support may not offend public policy, *see Honore v. Honore*, 149 Wis. 2d 512, 439 N.W.2d 827 (Ct. App. 1989), but we distinguished that provision from a nonmodifiable support order that lacked a reasonable time limitation. *See Krieman*, 214 Wis. 2d at 176–78.

*Krieman* found that an absolute child support agreement, with no time limitation or opportunity to review, offends public policy. *Id.* at 178. The agreement in question was incorporated into an order and provided that the father's $31,200 annual obligation "shall remain the same regardless of his income." *Id.* at 166. *Krieman* recognized that "a divorce stipulation that waives or sets a ceiling on child support and prevents modification of child support offends public policy." *Id.* at 176 (quoting *Ondrasek v. Tenneson*, 158 Wis. 2d 690, 692, 462 N.W.2d 915 (Ct. App. 1990)). This is because the future needs of the child may be unmet. *See id.*

Some of the considerations in evaluating the fairness of child support stipulations differ from those applicable to main-

pel in this case may result in unfairness to her. We are mindful of her contention that as a homemaker, she needs protection from the potential that her former husband, a skilled businessman and experienced accountant, would manipulate his income to avoid his maintenance obligations. We also recognize that fixed amount or percentage over fixed floor support orders may be motivated by concerns related to earning capacity or fluctuations in earnings. We conclude, however, that perpetuation of an unfair and litigation encouraging maintenance provision is not the remedy for the threat from which she seeks protection.

¶ 16.    Here, the trial court recognized Jane's concerns by ordering that she have access to financial records, such as monthly income and expense statements and accounts receivables. The court may take the corporation's retained earnings into account when deciding maintenance whenever a manipulation of corporate income might permit a party to avoid family financial obligations. *See id.* at ¶ 11.

> It does not matter what guise the obligor uses; whether the corporate income is labeled "retained earnings," "earned surplus," or "salary," a family court is authorized to pierce the corporate shield if it is convinced that the obligor's intent is to avoid financial obligations arising from the dissolution of the marital relationship. Depending upon the case, it is the obligation of the family court to determine if corporate income or profits are a necessary part of a well-managed corporation or an excuse for the sole shareholder to keep income or profits from being

tenance stipulations, however, so a modification of child support analysis would not control the analysis in the case before us.

considered when the family court is setting financial obligations.

*Id.* The trial court, therefore, is empowered to prevent the kind of income manipulation Jane seeks to avoid without the necessity of a one-sided modification stipulation. That Robert's support obligation is expressed as a percentage over a fixed floor of $2,500 per month further ensures that the order will generate maintenance that reflects Robert's ability to pay while securing a predictable base income for Jane.

¶ 17.   Jane asks that we rely on *Whitford v. Whitford*, 232 Wis. 2d 38, 41, 606 N.W.2d 563 (Ct. App. 1999), to overturn the trial court. *Whitford* employed estoppel to prohibit the payee from seeking a modification of limited-term maintenance, where the parties stipulated to a judgment that unambiguously had left maintenance open for no more than four years. *See id.* The factual underpinnings of *Whitford*, however, contrast to those here, where just one party can seek to modify maintenance for an indefinite time period. We conclude that *Whitford* does not control. Jane offers no countervailing public policy considerations to persuade us that the one-sided modification provision is valid.[6] Consequently, we conclude that the trial court cor-

---

[6] Without suggesting any possible merit, we merely note that our discussion does not include the following claims because no such contentions were made or developed: (1) The maintenance stipulation is so interwoven with the property division that one cannot be undone without the other; (2) the court should not have severed one clause without voiding the entire agreement; (3) the court's approval at the time of the divorce hearing is somehow binding on later litigation; and (4) purely contractual considerations apply. *See Waushara County v. Graf*, 166 Wis. 2d 442, 451, 480 N.W.2d 16 (1992) (we consider only the issues presented).

rectly determined that the one-sided indefinite modification provision offends goals of fairness and finality and must be voided on public policy grounds.

2. SUBSTANTIAL CHANGE OF CIRCUMSTANCES

¶ 18.   Under WIS. STAT. § 767.32, a trial court may revise the amount of maintenance ordered in a judgment of divorce when it finds there has been a substantial change in the parties' financial circumstances. *See Erath v. Erath*, 141 Wis. 2d 948, 953, 417 N.W.2d 407 (Ct. App. 1987). "The first step in a substantial change analysis is a factual inquiry." *Carpenter v. Mumaw*, 230 Wis. 2d 384, 390–91, 602 N.W.2d 536 (1999). It requires the trial court to determine the parties' financial circumstances when the award was made and their present financial circumstances. *See id.* We do not overturn the trial court's findings of fact unless they are clearly erroneous. *See id.*

¶ 19.   "Whether the change displayed by these factual findings is substantial is a question of law, which we review de novo." *Id.* at 391. However, when a question of law is intertwined with the factual findings, we give weight to the trial court's decision. *See id.*

¶ 20.   Here, the trial court believed Robert's testimony that he incorporated his accounting practice to avoid losing clients and key employees. Robert testified that forming the corporation "gave the perception of a larger firm, and I wanted to have that perception of the larger firm so our firm would grow because as a sole proprietor . . . I was losing clients because of the age of those clients being my age, they were retiring, giving

their business to their young sons, young son knows a young CPA, and I lose the client . . . that I've had for 30 years, had dad there and now the youngster wants to go his own way." Robert believed that forming the corporation with his younger employees would prevent them from leaving and give his firm the age variance needed to retain clients.

¶ 21. Robert further testified that when he formed the corporation, he realized his employees "were not going to come in unless we were all somewhat equal, and so it was an equalization of the salaries, and I realized I had to give up a little bit right at this point in order to do that." Robert and the salaries of the two other employees were set at $52,000 per year.

¶ 22. In 1997 Robert's income was $59,773, and in 1998 it was $77,496. Robert explained that if he had remained a sole proprietor, his income would not have been much more. Robert testified that in 1997, after paying maintenance, he had a negative disposable income. He hoped that by forming the corporation, his income would rebound to where it was at the time of the divorce.

¶ 23. Robert explained that when he formed the corporation, "it started, in essence at zero" and he brought into the corporation his equipment, files and some of his accounts receivables: "I entered into an agreement with the two fellows so some of my receivables that were collected would become a note payable to me as soon as the company generated enough billings and collected those billings that they could repay it to me." He testified that he transferred approximately $32,000 in receivables from his sole proprietorship to his newly formed corporation. Approximately $24,000

had been repaid, and he used some to pay maintenance and some to pay a portion of his tax liability.

¶ 24. Robert stated that he owed $78,000 to the federal government in overdue taxes and had to borrow to pay state taxes. He borrowed $100,000 from an acquaintance to pay his various obligations. Although he maintained a country club membership costing $7,000 per year, he believed the membership was to his advantage for business reasons. He further testified that he purchased a Florida condominium from a former client for $53,000, and that there was $44,871 still owing. He claimed that he purchased the condominium to facilitate the expansion of his accounting practice into the. area of business valuations for a Florida accounting firm.

¶ 25. Although Robert agreed his health was excellent, he also pointed out that he is being treated for high blood pressure and, now that he is older, it is more difficult to work the number of hours he did when he was younger. Robert denied diverting any income or not working up to his potential.

¶ 26. The trial court accepted as true Robert's testimony that the changes in his business structure were for legitimate business reasons. It gave less credence to Jane and her expert witness who testified to the effect that the changes were unnecessary and that Robert artificially deflated his income. The trial court, not the appellate court, judges the credibility of witnesses and the weight of their testimony. *See State v. Wyss*, 124 Wis. 2d 681, 694, 370 N.W.2d 745 (Ct. App. 1985). Appellate courts search the record for evidence to support findings reached by the trial court, not for evidence to support findings the trial court did not but could have reached. *See In re Estate of Dejmal*, 95 Wis. 2d 141, 154, 289 N.W.2d 813 (1980). Appellate court

deference considers that the trial court has the superior opportunity to observe the demeanor of witnesses and gauge the persuasiveness of their testimony. *See id.* at 151–52. Because Robert's testimony supports the trial court's findings of fact, we do not overturn them on appeal.

¶ 27.    The trial court's factual findings justify the conclusion that Robert's change in circumstances was substantial. At the time of the divorce, Robert's annual income was $109,000. In 1997 Robert's income was $59,773, and in 1998 it was $77,496. Robert testified that in 1997, after paying maintenance, he had a negative disposable income. He borrowed $100,000 to meet his obligations. These facts support the conclusion that Robert's change in circumstances was substantial.

¶ 28.    Jane contends, nonetheless, that the trial court erred because it failed to consider the $32,000 in accounts receivables Robert loaned to his corporation to get it started. We disagree. The court specifically rejected Jane's claim that Robert was shirking his maintenance obligations or diverting income. In so doing, it implicitly accepted Robert's explanation that the accounts receivables were used for legitimate business purposes and, as the corporation repaid him, he characterized the payments as income and used them for tax and maintenance obligations. Because Robert's testimony supports the trial court's determination, we do not overturn it on appeal. *See* WIS. STAT. § 805.17(2).

¶ 29.    We agree with the trial court that public policy considerations preclude the application of equitable estoppel. Because the trial court's factual finding of changed circumstances rests on its credibility determinations, it finds support in the record. The court

correctly concluded that the change in circumstances was substantial and justified the maintenance modification.

*By the Court.*—Orders affirmed.