In re the Marriage of:

# LaVerne C. Jalovec, n/k/a LaVerne C. Casella, Petitioner-Appellant-Cross-Respondent,

v.

# James A. Jalovec, Respondent-Respondent-Cross-Appellant.

Court of Appeals

*No. 2006AP1872. Submitted on briefs May 1, 2007. —Decided August 14, 2007.*

## 2007 WI App 206

(Also reported in 739 N.W.2d 834.)

On behalf of the petitioner-appellant-cross-respondent, the cause was submitted on the briefs of *Micaela H. Levine* of *Drinka, Levine & Masson, S.C.,* of Milwaukee.

On behalf of the respondent-respondent-cross-appellant, the cause was submitted on the brief of *Thomas A. Bailey* of *Bailey Law Office* of Milwaukee.

Before Curley, P.J., Wedemeyer and Fine, JJ.

¶ 1. CURLEY, P.J.   LaVerne C. Jalovec appeals the trial court's order modifying child support from $8333 a

month to a hold open until son Mark is emancipated, at which time a child support order would be entered for the remaining minor child at $3000 per month. She also appeals the trial court order requiring James to reimburse her only $16,819.99 of the $71,236.84 for uninsured medical expenses that she paid on behalf of the children. James appeals the trial court's order refusing to establish the effective date of the hold open child support order retroactive to the date LaVerne received notice of his motion to modify support.

¶ 2.  LaVerne argues that the trial court erroneously exercised its discretion when it modified child support because James was equitably estopped from seeking a modification of child support until September 1, 2006, according to a provision of the marital settlement agreement. Thus, she submits the trial court should not have entertained James's motion seeking a modification. In the alternative, she argues that no substantial change of circumstance occurred permitting a change in the child support order, as is required by WIS. STAT. § 767.32(1)(a) (2003–04).[1] LaVerne also contends that the trial court erred in calculating the amount she was entitled to be paid for uninsured medical expenses of the children. James submits that the trial court erroneously exercised its discretion when it refused to retroactively modify the child support order to the date LaVerne got notice of his motion to modify child support.

¶ 3.  Because the recent holding in *Frisch v. Henrichs*, 2007 WI 102, ¶ 67, 304 Wis. 2d 1, 736 N.W.2d 85,

---

[1] WISCONSIN STAT. § 767.32(1)(a) has since been reorganized and renumbered and is found in WIS. STAT. § 767.59(1f) (eff. Jan. 1, 2007). *See* 2005 Wis. Act 443, §§ 148, 267.

All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

and the holding in *Krieman v. Goldberg*, 214 Wis. 2d 163, 177–78, 571 N.W.2d 425 (Ct. App. 1997), have declared restrictive child support provisions similar to the one here against public policy, we determine that the provision at issue here is against public policy, and we decline to apply equitable estoppel against James. Further, a substantial change of circumstance occurred when James received placement of one of the children; therefore, the trial court properly entertained the motion to modify child support and the trial court did not erroneously exercise its discretion in setting the amounts for child support. The trial court also properly exercised its discretion in calculating the amount of money James had to pay LaVerne for uninsured medical expenses for the children. However, the trial court's order contains a mathematical mistake, which we have corrected.[2] Finally, we decline to address the trial court's refusal to set the starting date for the hold open of child support to the date that notice of the motion for a modification of child support was received by LaVerne because no reply brief was filed refuting LaVerne's claim that this issue was waived. Consequently, we affirm the trial court in all respects and direct it to correct the order.

## I. BACKGROUND.

¶ 4. LaVerne and James were married on February 12, 1983. Three children were born to the marriage, all of whom were minors when LaVerne filed for divorce on May 30, 2001. During the pendency of the case, the trial court appointed a guardian *ad litem* for the chil-

---

[2] On remand, the trial court should correct its order.

dren due to the parties' inability to resolve the custody and physical placement issues. However, on September 9, 2002, the parties entered into a global resolution of the case stipulating to the legal custody and physical placement of the children and resolving in a marital settlement agreement all of the support and property issues. As pertinent to this appeal, the parties originally agreed to joint legal custody of the three children and agreed that the primary placement of the children would be with LaVerne. With regard to child support, the parties' marital settlement agreement reads:

> 1. The respondent shall pay the amount of $100,000.00 per year toward the support of the minor children. Such payments shall be payable at the rate of $8,333.00 monthly, commencing on September 15, 2002.

> 2. Child Support shall not be changed based on the emancipation of the minor child, Phillip, nor based on a change in respondent's income, that not being considered a change of circumstances for purposes of diminishing child support through August 31, 2006. Further, respondent agrees that child support shall not be reviewed before September 1, 2006, at which time either party may ask the court for a review of said child support.

¶ 5. With regard to medical health care expenses, the parties' marital settlement agreement reads:

> The parties shall split equally the liability for all hospital, medical, dental, and related expenses not covered by insurance for each of the minor children, so long as the children are being treated by health care professionals who are covered by the childrens' health plan. If the children are treated by health professionals who are not covered by the plan, the party who selected said health professional shall be responsible for the

additional unreimbursed and uninsured expense due to the professional being outside of the plan. The exception to this will be the childrens' current treating therapists and health care professionals selected because of emergency.

The parties also agreed that: "Neither parent shall authorize non-emergency medical treatment for the children without the consent of the other parent. Also, all names, addresses, and telephone numbers of healthcare providers, including mental health providers, shall be exchanged." The parties both waived maintenance and divided an estate worth approximately $18.5 million.

¶ 6. Following the divorce, the parties had additional difficulties resolving matters which required the filing of motions with the court. A motion was filed on June 17, 2004, in which James sought the reappointment of the guardian *ad litem* because of concerns over the mental health of one of the children and requested an emergency hearing. Prior to the hearing date, the child, Mark, moved into James's home because of his substance abuse problems. Eventually the parties determined that because of Mark's ongoing problems, it was in his best interest that he be enrolled in a boarding school; however, the parties could not agree on which school he should attend. The parties were able to resolve the dispute over the boarding school and orally agreed to a stipulation which the trial court accepted. Unfortunately, because the school had, what James believed to be serious staffing problems, James decided that Mark should return to Wisconsin to reside with James. Later the parties, with the help of the guardian *ad litem,* agreed that Mark should remain primarily placed with James and the trial court modified the marital settlement agreement accordingly.

¶ 7. Several months later, James brought a motion to modify child support. LaVerne then brought a motion seeking reimbursement for uninsured medical expenses for the children. The assistant family court commissioner heard James's motion (but not LaVerne's) and refused to modify the child support. James brought a *de novo* motion in front of the trial court.

¶ 8. Prior to the trial court hearing these motions, James filed a motion seeking approval to relocate to Florida with Mark. LaVerne opposed the move. The trial court held a hearing on all the outstanding motions and awarded sole legal custody and primary placement of Mark to James and permitted him to move to Florida with Mark. As to the remaining motions concerning child support and medical expenses, the trial court appointed a special master and an accountant to take testimony and to make recommendations to the court. The special master heard testimony and submitted a report (and later a follow-up report) to the trial court in which the special master recommended that until Mark, who was living with James, was emancipated, James pay no child support for the child Jamie, and thereafter James pay child support for Jamie of $3000 a month. The special master also recommended that James pay LaVerne $16,815.99[3] to equalize the uninsured medical expenses LaVerne was seeking. The trial court accepted and adopted both of the special master's reports. James had requested the trial court to start the hold open of child support for Jamie on the date he provided notice to LaVerne of his motion for child support modification. This request was

---

[3] We note that the special master recommended that James pay LaVerne $16,815.99; however, the trial court's order specified that James was to pay LaVerne $16,819.99.

denied. James filed a motion for reconsideration of the starting date for the hold open, but later withdrew it. LaVerne filed a notice of appeal and James filed a cross-appeal.

## II. ANALYSIS.

*A. LaVerne's Appeal*

¶ 9.   LaVerne first argues that the doctrine of equitable estoppel prevents James from seeking a reduction in child support because the marital settlement agreement contains a provision that prevents the parties from seeking a child support modification until September 1, 2006,[4] and, in any event, she argues that there was no substantial change of circumstances as required by WIS. STAT. § 767.32(1)(a). She also claims the trial court erred by ordering only partial reimbursement for medical expenses she paid. We disagree.

### 1. Equitable Estoppel

¶ 10.   To invoke estoppel, a party must show

that both parties entered into the stipulation freely and knowingly, that the overall settlement is fair and equitable and not illegal or against public policy, and that one party subsequently seeks to be released from [its] terms . . . on the grounds that the court could not have entered the order it did without the parties' agreement.

*Rintelman v. Rintelman*, 118 Wis. 2d 587, 596, 348 N.W.2d 498 (1984). Resolution of this issue requires us

---

[4] In her original brief, LaVerne refers to this estoppel as "collateral estoppel." In her reply brief, she states that her use of the term collateral estoppel in her brief was "inadvertent."

to construe the stipulation agreement between the parties. The construction of a written contract is a question of law. *See Levy v. Levy*, 130 Wis. 2d 523, 528, 388 N.W.2d 170 (1986). We determine questions of law independently, with no deference to the conclusions of the trial court. *See id.* at 529.

¶ 11. "Once the elements of equitable estoppel have been established as a matter of law, the decision to actually apply the doctrine to provide relief is a matter of discretion." *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 2005 WI App 189, ¶ 10, 286 Wis. 2d 403, 703 N.W.2d 737, *aff'd*, 2006 WI 67, 291 Wis. 2d 259, 715 N.W.2d 620. "When the court approves . . . a stipulation and incorporates it into the divorce judgment, the doctrine of equitable estoppel is applied against the party seeking relief from the provision." *Lawrence v. Lawrence*, 2004 WI App 170, ¶ 6, 276 Wis. 2d 403, 687 N.W.2d 748.

¶ 12.  Because a fundamental precept of equitable estoppel is that it cannot be applied if the provision is against public policy, we first examine case law concerning child support stipulations that attempt to restrict the parties' ability to seek modifications.

¶ 13.  In *Ondrasek v. Tenneson*, 158 Wis. 2d 690, 462 N.W.2d 915 (Ct. App. 1990), this court concluded that a divorce stipulation that waives or sets a ceiling on child support and prevents modification of child support offends public policy.

> Thus, the statutory goal of providing for the best interest of the child would be defeated if a party is precluded from seeking child support necessary for the best interests of the child. The public policy of protecting children requires that there be an opportunity to determine whether a change in circumstances warrants a modification of child support.

*Id.* at 697. Later, in *Krieman,* 214 Wis. 2d at 177–78, involving a different provision affecting child support, we refused to enforce the child support provision that had set child support at a certain level regardless of the father's income. The stipulation there read: "Therefore, neither party shall under any circumstances have the right to petition the court for a modification of the child support provided for herein." *Id.* at 167. When the father fell behind in his child support payments, the mother argued that he was estopped from challenging the child support amount. *Id.* at 173. In deciding otherwise we explained "that the absolute stipulation agreement, with no time limitation or opportunity for review, is against public policy." *Id.* at 178.

¶ 14.   In *Motte v. Motte,* 2007 WI App 111, 300 Wis. 2d 621, 731 N.W.2d 294, *review denied,* 2007 WI 114, 737 N.W.2d 432 (No. 2005AP2776), we explored the issue of restrictive child support provisions in the context of a request for child support credit for a child who came to live with the payor. The mother of the child argued before the trial court that her former husband had stipulated that a change in their son's placement would not diminish his support obligation. *Id.,* ¶ 7. Consequently, she argued that her former husband was not entitled to credit for the time the child lived with him. *Id.* Ultimately, this court disagreed, and concluded:

> The problem is the statement [found in the parties' stipulation] that "[s]uch payments shall continue regardless of . . . any change in placement which may occur in the future." On its face, this clause aims to make support unmodifiable where a placement change would otherwise call for an adjustment.

*Id.*, ¶ 18. Thus, in *Motte,* we continued the line of cases that declared stipulations restricting access to the courts for child support modification purposes against public policy. *Id.*

¶ 15. More recently, in *Wood v. Propeck*, 2007 WI App 24, 299 Wis. 2d 470, 728 N.W.2d 757, this court was faced with a dispute concerning a stipulation in a divorce degree that read: "Neither party shall request a change in the amount of child support payments for a period of at least seven years from the date of the judgment entered herein, except as occasioned by catastrophic circumstances." *Id.*, ¶ 3. In rejecting the argument that this provision could withstand the public policy considerations first set forth in *Ondrasek,* we said:

> We now make explicit what was perhaps only implicit from the discussion in *Ondrasek*: any provision in a marital settlement agreement entered into by divorcing parties that purports to limit in any way a child support payee's ability to seek a support modification in the best interests of the children upon a substantial change in circumstances is against public policy; it thus cannot provide a basis to estop the payee from seeking a modification under WIS. STAT. § 767.32(1)(a).

*Wood,* 728 N.W.2d 757, ¶ 21.

¶ 16. Finally, our supreme court recently weighed in on the issue in *Frisch*, 736 N.W.2d 85. There, the supreme court voided a stipulation that set child support at $1050 a month and imposed a four-year moratorium on litigation. *Id.*, ¶¶ 9, 67. In deciding that the stipulation was against public policy, the court held that: "[T]he 1996 stipulation, which set a ceiling on

child support and prevented modification in the level of child support, is not enforceable and offends public policy." *Id.*, ¶ 67.

¶ 17.   Our review of these cases reveals that none of the child support provisions found in *Ondrasek*, *Krieman*, *Wood* or *Frisch* are identical to that in the instant matter. However, in extrapolating from the previously-mentioned holdings, we are persuaded that the provision here is against public policy.

¶ 18.   The marital settlement agreement provision in question states:

> Child Support shall not be changed based on the emancipation of the minor child, Phillip, nor based on a change in respondent's income, that not being considered a change of circumstances for purposes of diminishing child support through August 31, 2006. Further, respondent agrees that child support shall not be reviewed before September 1, 2006, at which time either party may ask the court for a review of said child support.

¶ 19.   In *Frisch*, the supreme court struck down a stipulation requiring a four-year moratorium on litigation, including a modification of child support. *Id.*, 736 N.W.2d 85, ¶¶ 9, 67. Thus, here, where the marital settlement agreement was entered into in September 2002 and precluded review until September 2006, the four-year prohibition preventing James from seeking a child support review for any reason contravenes the *Frisch* court's ruling. Additionally, the provision stating that James could not seek a review of child support if his income decreased is contrary to the holding in *Krieman*, where a provision preventing a child support review if the payor's income changed was found to be against public policy. *Id.*, 214 Wis. 2d at 178. On the

basis of these cases, as well as the persuasive language found in the other mentioned cases, we conclude that the child support provision in James and LaVerne's marital settlement agreement is against public policy and therefore cannot be enforced.[5] We recognize that such a holding is problematic for the family bar. Echoing the supreme court in *Frisch*,

> [W]e are sensitive to the importance and prevalence of stipulations in helping families going through difficult and litigious divorces and curbing disagreements among the parties. The ability to contract is fundamental to our legal system and may aid parties in settling their divorces more amicably. But the child's best interests are paramount.

*Id.*, 736 N.W.2d 85, ¶ 75.

¶ 20.  Further, as we advised in *Wood*, "[d]ivorcing parties must look to means other than child support to resolve the financial issues between them upon dissolution of their marriage." *Id.*, 728 N.W.2d 757, ¶ 21. Thus, we decline to apply the doctrine of equitable estoppel to prevent James from seeking a change in child support.

2.  Substantial Change in Circumstances

■

¶ 21.  We next look to see whether a change of circumstances has occurred. Wisconsin Stat. § 767.32(1)(a) provided:  "[A] revision under this section of a judgment or order with respect to an amount of child or family support may be made only upon a

---

[5] No case has determined whether the parties can prevent the emancipation of a child from constituting a change in circumstances, but that question is now moot because James seeks a modification due to the placement change of Mark.

finding of a substantial change in circumstances." *Id.* Once a substantial change in circumstances has been shown, the trial court must exercise its discretion as to modification of child support. *See Sellers v. Sellers*, 201 Wis. 2d 578, 585, 549 N.W.2d 481 (Ct. App. 1996). LaVerne argues that because James's income has increased, there is no financial change of circumstances.

¶ 22.   The phrase "substantial change in circumstances" is not defined in the statutes. The special master determined that a substantial change of circumstance had occurred and the trial court adopted the special master's report. The special master's report states:

> Placement of the minor children has been in flux since December of 2003. Without detailing that history, there is no question but that a change of circumstances has occurred; that such change is substantial; and, the change was never contemplated by the parties at the time of divorce. WIS. STAT. Sec. 767.32(1).

Because it involves a question of law, we independently determine whether the moving party has shown a substantial change in circumstances. *Greene v. Hahn*, 2004 WI App 214, ¶ 23, 277 Wis. 2d 473, 689 N.W.2d 657.

¶ 23.   In discussing what constitutes a substantial change in circumstances, the following factors were promulgated in *Miller v. Miller*, 67 Wis. 2d 435, 227 N.W.2d 626 (1975):

> An increase in support payments will be granted only where the party seeking such increase demonstrates that there has been a substantial or material change in the circumstances upon which the existing payments were predicated, and that such an increase is

481

> justified. The aging of the children, the increased cost of living, and the ability of the noncustodial parent to pay, the marital status of the parents, and the financial status of the parents and their spouses, are among the relevant factors to be considered in determining whether a material change in the circumstances has occurred.

*Id.* at 442–43 (footnotes and citations omitted).

¶ 24.   One shorthand definition for a substantial change in circumstances is that it is some unforeseen event which occurs after an agreement has been executed. Here, the parties never contemplated that one of the children would be living with James. The parties' stipulation assumed that all of the children would be living with LaVerne. While James's income fluctuated dramatically after the divorce, even assuming he had more money to spend, when Mark's placement was changed he also incurred significantly increased expenses. Mark was a teenager with many special needs requiring professional services in several different disciplines. Contrary to the original plan, each party ended up with the primary placement of one child. Each had estates with almost identical values. The trial court's decision to deviate from the child support guidelines was in keeping with the parties' own agreement. Ultimately, James will be required to pay $36,000 per year for the support of the child Jamie until she turns eighteen and graduates from high school, or until she turns nineteen, so long as she is pursuing an accredited course of instruction resulting in a high school diploma or its equivalent. The special master extensively discussed the reasons for his child support recommendation. The trial court properly determined that a substantial change of circumstance had occurred and required a child support modification.

### 3. Uninsured Medical Expenses

¶ 25.   LaVerne argues that the trial court erroneously exercised its discretion in "failing to order reimbursement of one-half of all of [her] medical payments made on behalf of the children." As noted in the parties' marital settlement agreement, the parties stipulated that they would split the uninsured medical expenses of the children, with James maintaining the underlying medical insurance. Additionally, the parties agreed to consult with one another and, if a provider was not covered by their insurance plan, the party who selected that health professional would be responsible for payment. The testimony before the special master revealed that neither party carefully followed the stipulation.

¶ 26.   LaVerne submitted numerous medical bills to the special master totaling $71,236.84, but admitted that among them were bills for mental health services that she never sent to the insurance company because the parties elected not to do this for privacy purposes during the marriage. James claimed that he expended $26,469.29 for uninsured medical expenses for the children; however, some of his requests were for expenses unrelated to the children's medical bills, and in one instance he independently flew in a counselor for Mark without obtaining LaVerne's permission.

¶ 27.   The special master's recommendations in the two separate reports on unreimbursed medical expenses, later adopted by the trial court, found that James was entitled to $7733 of uninsured medical bills after certain deductions were made. With respect to LaVerne's requests, the special master in his report references her expenses as totaling $71,236.84; however, on the next page, the report states:   "LaVerne paid uninsured medi-

cal expenses of $60,001.23."[6] The special master then subtracted $16,636.25 from the $60,001.23 amount, rather than the $71,236.84 amount actually sought by LaVerne, after finding that LaVerne failed to submit those expenses to the insurance carrier, contrary to the stipulation entered at the time of the divorce.

¶ 28.  LaVerne challenged the amounts that the special master arrived at after the report was received by the trial court. As a result, in a supplemental report, the special master examined some of LaVerne's requests for clarification, including her concern over the manner in which the special master calculated the uninsured medical expenses. The report indicated that James's mental health unreimbursed amounts apparently not submitted to the insurance company were accepted by the special master, but LaVerne's were not because LaVerne stipulated to James's while James challenged LaVerne's amounts. The special master also chided LaVerne's lawyer concerning her complaint that LaVerne did not have access to the insurance plan, and therefore should not have been penalized for not submitting some bills to the company. The report advised that LaVerne could have obtained the information by way of a discovery motion had she wanted it, and it was her burden, not the special master's, to prove certain expenses. However, the supplemental report does not address the mathematical mistake contained in the original report.

██

¶ 29.  We agree that the manner and reasoning of the special master, later adopted by the court, in determining the uninsured medical expenses of both parties,

---

[6] The error probably occurred because LaVerne initially sought $60,001.23, and later updated her expenses to $71,236.84.

were reasonable. The mathematical calculation was, however, flawed. As found by the special master, James had unreimbursed expenses totaling $7733 and LaVerne had gross uninsured expenses of $71,236.84. The special master reduced her expenses not sent to the insurance carrier by $16,636.25. Unfortunately, the $16,636.25 was subtracted from the earlier number, not the revised $71,236.84. The two accurate numbers reflecting each party's unreimbursed expenses are $54,600.59 for LaVerne, and $7733 for James, totaling $62,333.59. Dividing this number by two yields $31,166.80; $31,166.80, reduced by the amount paid by James, produces a sum payable to LaVerne of $23,433.80.[7]

*B. James's Appeal*

¶ 30.    James contends in his cross-appeal that the trial court erroneously exercised its discretion in failing to commence the hold open child support order on the date that LaVerne received notice of his motion to modify child support. James submits that the parties formally stipulated to James having primary placement of Mark on September 30, 2004. His motion was served on LaVerne on December 6, 2004. In the final order, the trial court set June 1, 2005, as the effective date for the hold open of child support. James filed a motion for reconsideration asking the trial court to change the effective date of the hold open. Approximately one month later, after LaVerne's attorney objected to the motion, James's lawyer wrote the court and advised that the motion was being withdrawn. LaVerne argues

---

[7] As noted, on remand the trial court is instructed to correct its order.

that this action constitutes a waiver of the issue. James has elected not to file a reply brief.

¶ 31. Because James has not responded to LaVerne's claim, we accept LaVerne's unrefuted argument. *Fischer v. Wisconsin Patients Comp. Fund*, 2002 WI App 192, ¶ 1 n.1, 256 Wis. 2d 848, 650 N.W.2d 75 ("An argument asserted by a respondent on appeal and not disputed by the appellant in the reply brief is taken as admitted."). James has waived this issue, and we decline to address it. For the reasons stated, we affirm the trial court's orders as corrected.

*By the Court.*—Orders corrected; and, as corrected, affirmed and cause remanded.