BRIGGS & STRATTON POWER PRODUCTS GROUP, LLC,
Plaintiff-Respondent,

v.

GENERAC POWER SYSTEMS, INC.,
Defendant-Appellant.

Court of Appeals

*No. 2010AP344. Oral argument December 7, 2010.
—Decided February 8, 2011.*

**2011 WI App 36**

(Also reported in 796 N.W.2d 234.)

160

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Christopher P. Banaszak* and *Robert S. Driscoll* of *Reinhart Boerner Van Deuren, S.C.* of Milwaukee and *Roddy W. Rogahn* of Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Donald H. Carlson* and *J. Timothy Maciolek* of *Crivello Carlson, S.C.*

Before Fine, Kessler and Brennan, JJ.

¶ 1. KESSLER, J.   Generac Power Systems, Inc. appeals the grant of summary judgment to Briggs & Stratton Power Products Group, LLC, declaring that under the terms of an asset purchase agreement Briggs did not assume all product liabilities of Generac's "Portable Products Division." Based on our *de novo* review of the contract and the undisputed facts, we conclude that the contract does not allocate product liability to Briggs for a portable generator manufactured by Generac and sold before the Portable Products Division came into existence.

## BACKGROUND

¶ 2.   Generac originally manufactured only generators but in the early 1960s began adding portable generators and other portable products to its product line. By early 1997, in preparation for sale of the portable products aspect of its business, Generac created a "Portable Products Division" and began operating the Division out of a facility in Jefferson, Wisconsin. On May 5, 1998, Generac sold the assets, and assigned some of the related liabilities of the Portable Products Division to GPPC, Inc. The terms of that sale are described in a forty-four page, single spaced "Asset Purchase and Sale Agreement," between Generac ("Seller") and GPPC, Inc. ("Purchaser"). In 2001, GPPC, Inc.[2] sold its rights and obligations under the Agreement to Briggs & Stratton Corporation.[3] It is undisputed that the 1998 Agreement is binding on both parties to this appeal.

---

[2] By this time, GPPC, Inc. had changed its name to Generac Portable Products Inc.

[3] Generac Portable Products Inc. eventually changed its name to Briggs & Stratton Power Products Group, LLC. Because the various names by which the parties have been known are not material to the outcome of this appeal, we will refer to

¶ 3. In 2005, a federal lawsuit was filed in Alabama after Kimberly Thompson was injured while using a portable gas generator manufactured by Generac in 1992 and sold to Generac's customer, W.W. Grainger. Thompson sued Generac, among others, and Generac tendered its defense to Briggs based on Generac's interpretation of the Agreement. Briggs declined to accept the defense based on its interpretation of the Agreement. Briggs filed a declaratory judgment action in Wisconsin against Generac seeking a determination of the rights and obligations of the parties under the Agreement in relation to the Thompson products liability claim. Ultimately, cross-motions for summary judgment were resolved in favor of Briggs by the trial court, holding that Briggs had no liability for the Thompson litigation under the Agreement. Specifically, the trial court found that the Agreement limited Briggs' liabilities to the period between January 1, 1997, the date the trial court determined to be the creation of the Division, and June 30, 1998, the Closing Date identified in the Agreement. This appeal followed.

## STANDARD OF REVIEW

¶ 4. In reviewing the grant or denial of summary judgment, we apply the same methodology as the trial court and review the trial court's decision *de novo*. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). The interpretation of a contract is a question of law that we review independently with no deference to the conclusion of the trial court. *Jalovec v. Jalovec*, 2007 WI App 206, ¶ 10, 305

plaintiff simply as Briggs and the defendant simply as Generac.

Wis. 2d 467, 739 N.W.2d 834; *Edwards v. Petrone*, 160 Wis. 2d 255, 258, 465 N.W.2d 847 (Ct. App. 1990).

## DISCUSSION

¶ 5.  Generac argues that assets and liabilities transferred as part of the Division relate to Generac's entire history of manufacturing portable products, which began in the early 1960s. Generac additionally contends that because the drafters chose the Closing Date specified in the Agreement as the date on which the Purchaser's assumption of the Seller's liabilities ended, we would be re-writing the contract to impose an earlier limitation on the assumption of those liabilities.

¶ 6.  Briggs responds that the Agreement only requires it to assume liabilities of the Seller which relate to the Seller's "operation of the Division prior to the Closing Date." Because the Division did not exist before late 1996 or early 1997, Briggs contends that a generator manufactured by Generac in 1992 was never part of Generac's "operation of the Division" under the Agreement.

¶ 7.  When an appeals court interprets a contract, the language of the contract " 'must be understood to mean what it clearly expresses.' " *Raasch v. City of Milwaukee*, 2008 WI App 54, ¶ 11, 310 Wis. 2d 230, 750 N.W.2d 492 (citation omitted). " 'A court may not depart from the plain meaning of a contract where it is free from ambiguity. In construing the terms of a contract, where the terms are plain and unambiguous, it is the duty of the court to construe it as it stands.' " *Id.* (citation omitted).

¶ 8.  Rules of grammar are considered when construing a contract. *See Drinkwater v. State*, 69 Wis. 2d

165

60, 73, 230 N.W.2d 126 (1975) (explaining how semicolons function to separate clauses). The capitalization of nouns also contributes to clear expression in a contract. *See Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 44, 330 Wis. 2d 340, 793 N.W.2d 476 ("Significantly, the language of section 14 [of the contract] exhibits different capitalization to denote 'this Agreement,' meaning [the contract] itself, and 'their agreement,' meaning the parties' agreement altogether.") (emphasis omitted). We also "cannot ignore punctuation when interpreting a contract." *Baker v. McDel Corp.*, 53 Wis. 2d 71, 79, 191 N.W.2d 846 (1971). Qualifying phrases refer to the next preceding antecedent unless the context clearly shows the contrary. *Hope Acres Inc. v. Harris*, 27 Wis. 2d 285, 291, 134 N.W.2d 462 (1965).

¶ 9. The parties agreed at oral argument and before the trial court that this dispute can be resolved based on the language in the Agreement and that there are no undisputed material facts. We turn to the Agreement to determine whether Briggs agreed to assume liability for a product Generac manufactured in 1992, approximately five years before it created the Portable Products Division. In the Agreement, GPPC, Inc. and Generac accepted the following definitions, and allocated the following specific liabilities, which are relevant to this appeal:

## RECITALS

A. Seller's Portable Products Division (the "Division") consists of Seller's production, marketing, sales, engineering, research and development (and in the UK, Spain and Germany, importation) and administration operations located at its facilities in Jefferson, Wisconsin, Winsford, Cheshire, England, Wabein, Germany and Tarragona, Spain.

B.   The Division is engaged in the business of manu-
     facturing, marketing, importing and selling por-
     table power generators, pressure washers and, in
     the USA, portable welders (the "Business").

. . . .

## AGREEMENTS

3. *Assumption of Liabilities.* Purchaser shall assume
and agree to pay, perform and discharge the liabilities
and obligations of the Seller which relate to the Divi-
sion . . . as set forth below in this section 3 (the "As-
sumed Liabilities"). The Assumed Liabilities shall con-
sist only of the following[:]

. . . .

3.02   All liabilities and obligations of the Seller related
       to the Division arising in the ordinary course of
       business after the Closing Date directly on ac-
       count of Seller's ownership and operation of the
       Division prior to the Closing Date.

. . . .

3.05 All liabilities and obligations arising from the
ownership and operation of the Purchased Assets on
and after the Closing Date.

The Closing Date is identified in the Agreement as June
30, 1998.

¶ 10.   Interpretation of the Agreement requires
reliance on the basic rules of grammar. As we learned in
school, a noun is "any member of a class of words
that . . . serve as the subject of a verb . . . and refer to an
entity, quality, state, action, or concept."[4] In addition, a

---

[4] MERRIAM-WEBSTER   DICTIONARY,   http://www.merriam-
webster.com/dictionary/noun. (last visited 01/27/2011).

"proper noun" is "a noun that designates a particular being or thing, . . . and is usually capitalized in English."[5] When a noun is not capitalized in an English sentence, the reference is to a non-specific noun. For example, "corporation" or "contract." When a noun is capitalized in an English sentence, it refers to a specific noun. For example, "Generac Power Systems, Inc." (a corporation) or "Asset Purchase and Sale Agreement" (a contract).

¶ 11. Although the record does not disclose the drafters of the Agreement,[6] they took the trouble to define the specific terms they chose to use as proper nouns throughout the Agreement. "The Division," capitalized all throughout the Agreement, is identified in the Agreement as Generac's "Portable Products Division." It is undisputed that the Division did not exist as a separate identifiable entity before late 1996 or early 1997. The Agreement also defines the "Business" of the Division as "the business of manufacturing, marketing, importing and selling portable power generators, pressure washers and, in the USA, portable welders."

¶ 12. "As a general rule, a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation." *Fish v. Amsted Indus., Inc.*, 126 Wis. 2d 293, 298, 376 N.W.2d 820 (1985) (quotation marks and citation omitted). An exception to this general rule is " 'when the purchasing

---

[5] MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/proper+noun?show=0&t=1295452293. (last visited 01/27/2011).

[6] At oral argument, counsel for both parties conceded that the record does not identify the drafter(s) of the Agreement.

corporation expressly or impliedly agreed to assume the selling corporation's liability.' " *Id.* (citation omitted). The liabilities Briggs expressly assumed in the Agreement were numerous; however, products liability was not expressly included. Because products liability was not included in other Assumed Liabilities under the Agreement, we conclude that Briggs did not assume Generac's products liability under the Agreement. *See FAS, LLC v. Town of Bass Lake*, 2007 WI 73, ¶ 27, 301 Wis. 2d 321, 733 N.W.2d 287. (" '[T]he express mention of one matter excludes other similar matters [that are] not mentioned.' ") (citation omitted; second set of brackets in *FAS*).

¶ 13.   As relevant to this appeal, the parties agreed the Assumed Liabilities consist only of "[a]ll liabilities . . . of [Generac] related to the Division arising in the ordinary course of business after the Closing Date directly on account of [Generac's] ownership and operation of the Division prior to the Closing Date." The qualifying phrase "prior to the Closing Date" modifies the next preceding phrase "directly on account of Seller's ownership and operation of the Division." *See Hope Acres, Inc.*, 27 Wis. 2d at 291. Because the Division did not exist until January 1, 1997,[7] Generac could not have owned or operated the Division before that time. The Closing Date identified in the Agreement is June 30, 1998. Thus the Assumed Liabilities for which Briggs agreed to be responsible must relate to Generac's ownership or operation of the Division between January 1, 1997 and June 30, 1998. The portable generator

---

[7] The trial court identified January 1, 1997, as the date of the Division's creation. We accept that date although whether the date is late 1996 or January 1, 1997, has no impact on this case because the generator giving rise to the Thompson suit was manufactured and sold in 1992.

involved in the Thompson claim was manufactured in 1992 and sold by Generac several years before the Division existed. Generac did not own the generator when it operated the Division or when it sold all of the Purchased Assets to Briggs.

¶ 14.   Generac also argues that because the generator malfunctioned after the Closing Date, language in the Agreement requiring Briggs to assume "[a]ll liabilities and obligations arising from the ownership and operation of the Purchased Assets on or after the Closing Date" provides an alternative basis for Briggs' liability. The "Purchased Assets" are exhaustively and meticulously defined in the Agreement and these appear to include all assets of the Division, both in the United States and elsewhere.[8] There is no evidence that this portable generator was part of the Purchased Assets which Briggs acquired after June 30, 1998, and for which Briggs assumed liability under the Agreement. Nor is any act by Briggs in its "ownership and operation" of the Purchased Assets alleged to have contributed to the malfunction of this generator. We find no provision in the Agreement by which Briggs assumed liability for products Generac manufactured and sold prior to the creation of the Division.

## CONCLUSION

¶ 15.   For all the foregoing reasons, based on the clear terms of the Agreement, we conclude that Briggs did not assume liability for the portable generator

---

[8] The Purchased Assets include, but are not limited to:   inventory, personal property, vehicles, intangible assets, leases, contracts, records and documents, notes and accounts receivable.

170

manufactured and sold by Generac several years before the Division came into existence.

*By the Court.*—Order affirmed.