COURT OF APPEALS
DECISION
DATED AND FILED

March 23, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2021AP1114**

**STATE OF WISCONSIN**

Cir. Ct. No.  2010FA160

**IN COURT OF APPEALS
DISTRICT IV**

MICHAEL S. EISENGA,

   PETITIONER-APPELLANT-CROSS-RESPONDENT,

V.

CLARE A. HAWTHORNE P/K/A/ CLARE A. EISENGA,

   RESPONDENT-RESPONDENT-CROSS-APPELLANT.

APPEAL and CROSS APPEAL from orders of the circuit court for Columbia County:  TODD J. HEPLER, Judge.  *Affirmed.*

Before Blanchard, P.J., Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. § 809.23(3).**

¶1     PER CURIAM. The circuit court found Michael Eisenga in contempt for failing to pay child support to Clare Hawthorne and as a remedial

sanction for that contempt the court ordered Eisenga to pay Hawthorne $106,224.17, which the court determined represented her costs of litigating the contempt issue. Eisenga argues on appeal that this amount is too high; Hawthorne cross appeals, arguing that it is too low. We affirm the court, rejecting both the appeal and the cross appeal. This is based on our conclusions that neither party establishes that the court erroneously exercised its discretion in awarding that amount to Hawthorne as litigation costs resulting from Eisenga's undisputed failure to make child support payments in the amounts ordered by the court.

¶2    Separately, Eisenga appeals an order modifying the judgment of divorce to grant Hawthorne tie-breaking authority in deciding which school the parties' children attend. Eisenga contends that the circuit court should have rejected Hawthorne's motion because Hawthorne did not specifically seek relief under WIS. STAT. § 806.07 (2021-22) from a stipulation of the parties regarding custody decisions.[1] He further argues that Hawthorne was equitably estopped from seeking this modification based on the terms of the stipulation, which were adopted into the judgment of divorce. In the alternative, Eisenga makes an undeveloped argument that the court lacked a factual basis to modify the judgment. We reject all of Eisenga's arguments regarding the modification.

¶3    Accordingly, we affirm both challenged orders and reject the cross appeal.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

## BACKGROUND

¶4      Eisenga and Hawthorne were divorced in 2011.  The parties had three children during their marriage who were and continue to be minors.

¶5      The judgment of divorce incorporated a settlement agreement of the parties regarding the topics of custody and physical placement of the children.  The settlement provides that "[t]he children shall attend school (grades K-4 through 12) at [an identified school, hereafter "the school identified in the settlement"], unless both parties agree that a child shall attend another school."

¶6      Financial matters and child support were addressed by an arbitration award that was also incorporated into the judgment.  Under this award, Eisenga is obligated to pay to Hawthorne a minimum of $15,000 per month in child support.

¶7      In August 2018, Eisenga filed the most recent motion to modify child support.  He averred in connection with that motion that there had been a substantial change in circumstances because his monthly income had declined significantly since the divorce.  On a related point, he averred that in order to meet the child support obligations he was having to draw down assets from his business activities and that these drawdowns would hamper his ability to generate future income.

¶8      Starting no later than December 2018 Eisenga began making child support payments that were substantially lower than his $15,000 monthly obligation.  In July 2019, Hawthorne moved for an order finding Eisenga in contempt for failing to pay child support.

¶9      In October 2019, the circuit court held an evidentiary hearing to address both Eisenga's motion to lower his child support obligation and Hawthorne's motion for contempt.  In February 2020, the court issued an order

3

denying Eisenga's motion, *see* ***Eisenga v. Hawthorne***, No. 2020AP1404, unpublished slip op. (WI App Dec. 23, 2021) (rejecting Eisenga's challenge of the circuit court's ruling on his modification motion), and finding him in contempt for failing to pay child support. The court took this action pursuant to chapter 785 ("Contempt Of Court"). *See* WIS. STAT. § 785.01(1)(b) ("contempt of court" means, in part, intentionally disobeying an order of the court). This chapter includes WIS. STAT. § 785.04, which authorizes circuit courts to impose as a remedial sanction "payment of a sum of money sufficient to compensate a party for a loss … suffered by the party as the result of a contempt of court." *See* § 785.04(1)(a).

¶10    The parties further litigated regarding the appropriate conditions for Eisenga to purge the contempt. In July 2020 Eisenga paid his child support arrearages in full. The circuit court ruled that the payment of arrearages partially purged Eisenga's contempt, but this left the issue of Eisenga being required to pay for Hawthorne's litigation costs resulting from his contempt as a partial remedial sanction.[2]

¶11    Hawthorne took the position that as an appropriate remedial sanction Eisenga should be ordered to pay her $265,560.43 for litigation costs that she

---

[2] Here and at other times, the circuit court spoke in terms of Hawthorne's "attorney fees," however we understand the court to have been referring at all times to a broader category of expenses that we refer to as "litigation costs," and neither party now suggests a different interpretation. *See* ***Town of Seymour v. City of Eau Claire***, 112 Wis. 2d 313, 320, 332 N.W.2d 821 (Ct. App. 1983) (concluding WIS. STAT. § 785.04(1)(a) authorizes circuit court to award attorney fees "and other litigation costs").

Separately, we note that the circuit court and the parties on appeal discuss the issue here as involving which of Hawthorne's litigation costs were "related" or "unrelated" to the contempt issue, viewing the award of litigation costs as one condition of purging the contempt. *See* ***Frisch v. Henrichs***, 2007 WI 102, ¶64, 304 Wis. 2d 1, 736 N.W.2d 85 (it is a requirement of a purge condition that it "'should be *reasonably related* to the cause or nature of the contempt'" (emphasis added; quoted source omitted)). While "related" and "unrelated" appears to be a close proxy for current purposes, we generally speak in terms of the litigation costs that are, in the words of WIS. STAT. § 785.04(1)(a), the result of or resulting from Eisenga's contempt.

incurred over an approximately two-year period. Eisenga did not dispute that he should have to pay, as a partial remedial sanction, Hawthorne's pertinent litigation costs. But he took the position that Hawthorne should be awarded a total of $5,000 on the ground that, even if Eisenga had not failed to meet his monthly child support obligations, Hawthorne still would have incurred all of the rest of her claimed litigation costs. The court ultimately awarded Hawthorne $106,224.17, which was 40% of what Hawthorne requested out of the billing entries she submitted. The court said that this was a reasonable approximation of Hawthorne's litigation costs that resulted from the contempt issue, based on the court's review of Hawthorne's billing records and the court's awareness of how the litigation had unfolded, given that the court had presided over all aspects of the case to that point. The court explained that it arrived at the discount of 40% as the court's estimate of Hawthorne's costs that had in fact resulted from Eisenga's contempt, without attempting to add up an exact dollar amount, billing entry by billing entry. The court explained that such a detailed tallying would be "not practical and certainly not in the interest of judicial economy," in part because it would require "spend[ing] additional weeks reviewing and taking testimony" about the details of billing entries.

¶12     Turning to the choice of school issue, Hawthorne moved to amend the judgment of divorce permitting the children to transfer from the school identified in the settlement to another school. After mediation failed to resolve the issue, the circuit court held an evidentiary hearing. The court granted the motion, modifying the judgment to give Hawthorne tie-breaking authority in choosing the schools that the children would attend.

¶13     Eisenga appeals the order granting a portion of Hawthorne's litigation costs as a contempt sanction. Hawthorne cross appeals this order. Eisenga also

appeals the order modifying the divorce judgment regarding school placement. We provide additional background pertinent to each issue as needed to our discussion.

## DISCUSSION

### I. Litigation Costs For Contempt

¶14     We provide below the pertinent legal standards, followed by additional background on the remedial contempt sanction of awarding litigation costs. We then address the respective arguments of the parties.

¶15     We first pause to briefly explain that two topics are *not* at issue in this appeal:  the reasonableness of the rates charged by Hawthorne's attorneys and the appropriateness of hours they billed. Both in the circuit court and now on appeal, Eisenga has essentially ignored these topics. Instead, the parties engage in a narrow dispute about whether the circuit court erred in determining that 40% of Hawthorne's requested litigation costs resulted from Eisenga's contempt.  The parties take this narrow approach despite the fact that these two topics are often the focus of disputes over litigation costs. *See **Johnson v. Roma II-Waterford LLC***, 2013 WI App 38, ¶17, 346 Wis. 2d 612, 829 N.W.2d 538 (circuit court must use "lodestar" approach as starting point for awarding fees under statute, where starting point is "'the number of hours reasonably expended, multiplied by a reasonable hourly rate, with upward or downward adjustments then made after taking other relevant factors into account'" (quoted source omitted)).  Accordingly, Eisenga has forfeited an argument that the litigation costs submitted by Hawthorne's attorneys were unreasonable based on these considerations. *See **Schill v. Wisconsin Rapids Sch. Dist.***, 2010 WI 86, ¶45 & n.21, 327 Wis. 2d 572, 786 N.W.2d 177.

*Legal Standards*

¶16    As noted, a circuit court has the power to sanction contempt of court through "remedial sanctions," WIS. STAT. § 785.02, which are imposed "for the purpose of terminating a continuing contempt of court," WIS. STAT. § 785.01(3). As referenced above, among other remedial sanctions that a court "may impose," it may require the "[p]ayment of a sum of money sufficient to compensate a party for a loss or injury suffered by the party as the result of a contempt of court," potentially including attorney fees and other litigation costs. WIS. STAT. § 785.04(1)(a); ***Town of Seymour v. City of Eau Claire***, 112 Wis. 2d 313, 332 N.W.2d 821 (Ct. App. 1983).

¶17    When reviewing a challenge to a circuit court's decision to sanction a party based on a finding of contempt, we consider whether the court properly exercised its discretion. ***Benn v. Benn***, 230 Wis. 2d 301, 308, 602 N.W.2d 65 (Ct. App. 1999). Beyond the decision to sanction the party, the court's choice of "the type of remedial sanctions to impose for contempt is [also] a discretionary determination." *See **id.*** (citing WIS. STAT. §§ 785.02, 785.04(1)). This includes deciding whether to award litigation costs under § 785.04. *See **id.*** Similarly, the amount of litigation costs awarded by a court is a discretionary decision. *See **Rand v. Rand***, 2010 WI App 98, ¶6, 327 Wis. 2d 778, 787 N.W.2d 445.

¶18    Turning to the specific topic of the contempt here, Eisenga's obligations to pay set amounts of child support, there is no dispute that what he paid was substantially less than that required by court order. However, the contempt sanctions issue is not solved only based on a finding of a failure to pay child support. Instead, an attempt to impose contempt sanctions, as was litigated here, also requires findings by the court that "(1) the person is able to pay, and (2) the refusal to pay is

willful and with intent to avoid payment." *See **Benn***, 230 Wis. 2d at 309-10; *see also* WIS. STAT. § 785.01(1)(b).

*Additional Background*

¶19 As noted above, Eisenga moved to modify his child support obligations in August 2018, began making payments that were substantially less than his court-ordered child support obligations in December 2018, and was found in contempt in February 2020 following an evidentiary hearing. At the hearing, Eisenga and Hawthorne testified, and each party called an expert witness to testify regarding Eisenga's finances.

¶20 In July 2020, the circuit court issued an order regarding the conditions Eisenga would need to meet to purge his contempt. The court operated from the premise that Eisenga lacked liquid assets. Given that premise, the court ordered him to transfer a lake house that he owned to Hawthorne, who would sell it and use the proceeds to cover Eisenga's arrearages, with any excess proceeds being held in trust by the court. There is no dispute that Eisenga, on the same day as the court ordered these conditions, produced cash to pay down his arrearages without selling the lake house, and then moved for an order that he had purged his contempt. Hawthorne took the position that the lake house should still be sold as the court had ordered, in order to create proceeds that could be placed in a trust for future support of the children. In September 2020, the court ruled that Eisenga had purged his contempt as to the arrearages and it stayed all existing purge conditions, but it noted that, as an additional remedial sanction, Eisenga would be responsible for paying Hawthorne's litigation costs that resulted from the contempt.

¶21 In January 2021, the circuit court issued an oral ruling followed by a written decision outlining how the court would proceed in deciding the amount of

Hawthorne's litigation costs that Eisenga would have to pay. The court ruled that Hawthorne bore the burden to produce evidence that her costs were "related to" the contempt issue and ordered her to provide billing records.

¶22 Hawthorne's attorneys submitted billing records to the circuit court. Hawthorne initially asked the court to award her $297,187.93 in litigation costs incurred from the time Eisenga filed his motion to modify child support in August 2018 through the parties' dispute over proper contempt purge conditions in September 2020. She later amended her request downward to $265,560.43, having now excluded litigation costs incurred in connection with other matters, such as a grandparent visitation issue.

¶23 Eisenga took the position that Hawthorne should be awarded no more than $5,000. In support of that request, Eisenga submitted to the circuit court a color-coded markup of Hawthorne's billing records that purported to reflect which entries were clearly entries resulting from the contempt, which were clearly not, and which were ambiguous on this topic, in addition to entries related to litigation over appropriate purge conditions, which he argued were unnecessary and lacked merit.

¶24 In June 2021, the circuit court made a decision now challenged by both sides, granting Hawthorne 40% of her requested litigation costs, amounting to $106,224.17. The court noted that "[t]here can be no question that there is overlap between" the litigation costs that had been "incurred by Ms. Hawthorne in addressing" contempt issues and those that she had incurred in addressing Eisenga's motion to modify child support. The court explained further that

> the issues of contempt and Mr. Eisenga's motion to revise his child support are inextricably intertwined. In prosecuting the contempt motion, Ms. Hawthorne was required to establish that Mr. Eisenga's failure to pay his child support obligation was willful—in other words that Mr. Eisenga had

9

> the ability to pay and chose not to do so. In opposing Mr. Eisenga's motion to revise his child support, Ms. Hawthorne was required to establish Mr. Eisenga had the ability to pay.

The reasoning of the court was that Eisenga's ability to pay child support was a contested issue of fact that was relevant to establishing that Eisenga was in contempt as noted above, as noted *supra* at ¶18, and also relevant to Eisenga's theory for why a revision of his child support obligation downward was warranted due to his allegedly worsening finances. *See* WIS. STAT. § 767.59(1f)(a), (c)1., 3. ("change in payer's income" or "earning capacity" "may constitute a substantial change of circumstances sufficient to justify revision" of child support obligation).

¶25 The circuit court further explained that it had "undertaken a comprehensive review of the submissions of the parties" and that

> [i]t is simply not practical and certainly not in the interest of judicial economy to spend additional weeks reviewing and taking testimony to determine which line items in the billing statement are related to the contempt issues, which billings relate to the revision of support motion and which billings are entirely unrelated.
>
> As such, the Court has determined that *approximately 40 percent of the costs and fees requested are reasonable and related to the contempt matter for which attorney fees are being awarded.*

(Emphasis added.) This approach was consistent with a statement the court had earlier made to the parties. The court told them that, given the fact that the parties addressed the contempt issues at the same time as other issues in a heavily litigated case, "there is no conceivable way this court or any other court reviewing this issue will be able to formulate a precise award of attorney fees" resulting from the contempt alone—even if the court and the parties were to devote additional resources eliciting and debating details about particular billing entries.

¶26 The circuit court relied on *Lane v. Sharp Packaging Systems, Inc.*, 2002 WI 28, 251 Wis. 2d 68, 640 N.W.2d 788, for the following proposition: a circuit court can properly exercise its discretion in approximating the percentage of litigation costs generated due to sanctionable conduct of another party when, in the words of the court here, "the need to avoid prolonged argument regarding fees and costs outweigh[s] the need for a precise determination." As context to this reasoning, the court noted that the "parties have engaged in near-continuous litigation since the time of the divorce," which was not in the interests of the children or parties.[3]

*Direct Appeal*

¶27 Eisenga argues that the circuit court erroneously exercised its discretion in settling on an award equal to 40% of the litigation costs that Hawthorne requested. Eisenga makes numerous arguments: that the circuit court erroneously awarded Hawthorne costs resulting from his motion to modify his child support obligation; that the evidence did not support awarding Hawthorne 40% of her requested costs; and that the court failed to make a finding as to the portion of Hawthorne's costs resulting from his contempt as opposed to other sources. We conclude that Eisenga fails to establish that the circuit court clearly erred in making any finding or erroneously exercised its discretion.

¶28 We begin our analysis by noting that we assume without deciding that Eisenga is correct about one broad framing point and that we agree with him on

_____

[3] Supporting the circuit court's observations, Eisenga's child support obligation has been the subject of multiple episodes of substantial litigation. *See Eisenga v. Eisenga*, No. 2013AP91, unpublished slip op., ¶¶5-13 (WI App Oct. 3, 2013); *Eisenga v. Eisenga*, No. 2016AP1946, unpublished slip op., ¶¶2-7 (WI App Oct. 5, 2017). Throughout this litigation, Eisenga has been unsuccessful in moving for reductions in his support obligation. *See Eisenga*, No. 2013AP91, ¶¶4, 12; *Eisenga*, No. 2016AP1946, ¶¶1, 3-4.

another. We assume without deciding that he is correct that, under WIS. STAT. § 785.04(1)(a), the circuit court's authority to require Eisenga to pay Hawthorne's litigation costs as a remedial sanction is strictly limited to the portion of her litigation costs that were solely the result of his contempt, and not those costs resulting from his motion to modify his child support obligation, if the latter costs would have been incurred even absent Eisenga's contempt. Further, we agree with Eisenga that the court, in ruling on the litigation costs issue, did not purport to conclude that Eisenga's motion to modify child support was frivolous or that he had engaged in "overtrial." Bringing these two points together, we operate from the premise that the court did not award to Hawthorne her litigation costs on any basis other than § 785.04(1)(a).

¶29 With that premise in mind, we conclude that Eisenga fails to show that the circuit court's analysis was erroneous. Eisenga's multiple arguments in his appeal share a common flaw. The flaw is that, by granting Hawthorne 40% of her requested litigation costs, the circuit court necessarily awarded her costs that resulted from his motion to modify child support, which would have been incurred absent his contempt. One way Eisenga expresses this is to assert that the court did not "make any finding with respect to the amount of time spent [by Hawthorne's attorneys] on the contempt aspect of the case." We now explain why this assertion depends on an unreasonable interpretation of the court's order.

¶30 It is true that the circuit court provided few details or examples supporting its determination that 40% was a reasonable approximation of the litigation costs proportional to that which resulted from Eisenga's contempt, while the remaining 60% resulted from other work. At the same time, however, the following two factual bases for the court's determination are evident in the record and are referred to in the court's written decision.

¶31    First, the circuit court explained that it had conducted what it characterized as a "comprehensive review" of Hawthorne's billing records. Any such review would necessarily take into account how entries were characterized and their timing, providing a sound basis for the court to sort. The court demonstrated its ability to sort by identifying most of the costs reflected in the billing entries as *not* resulting from the contempt, *i.e.*, the 60% of costs that the court excluded.

¶32    Second, in referencing the lengthy and complex procedural context surrounding all issues resulting from Eisenga's contempt, the circuit court made clear that it had relied on its firsthand perspective of the proceedings. Having had the benefit of participating in all proceedings—the results of the contempt and otherwise—and having read all of the parties' many written submissions, the court was in an excellent position to assess the reasonably awardable portion of the litigation costs reflected in Hawthorne's billing records. Eisenga appears to suggest that these bases were insufficient to support the court's determination of the amount appropriate as a remedial sanction, and effectively relieved Hawthorne of her burden to establish which of her litigation costs were the result of his contempt. But he fails to make a developed argument along these lines that meaningfully applies pertinent standards, including the standard that we affirm the court's factual findings absent a showing of clear error.

¶33    Another indication that the circuit court properly understood its task in deciding what proportion of Hawthorne's litigation costs resulted from the contempt issues was the court's reliance on *Lane*. As the circuit court here noted, under *Lane*, it may be a proper exercise of discretion for a circuit court to approximate the portion of a party's litigation costs that are awardable when some costs are awardable and some not. *See Lane*, 251 Wis. 2d 68, ¶¶63-66. In *Lane*, the circuit court was presented with a motion to recover the attorney fees of a party

that had prevailed on two discovery motions, and the court determined that one of the underlying discovery motions was sufficiently meritorious to avoid an award of fees but the other was not. *Id.*, ¶63. The circuit court resolved this by awarding 50% percent of the prevailing party's costs "pertaining to all of the matters brought before" the court, rather than "require that [the prevailing party] say how much [work the party] did on this part of the motion or … on the other." *Id.* Our supreme court ruled that this was not an erroneous exercise of discretion under the circumstances. *Id.*, ¶66.

¶34 It is relevant to the circuit court's application of *Lane* here that the court made the following findings that Eisenga does not now show are clearly erroneous: taking further evidence regarding the nature of specific billing entries would have been an inefficient use of limited judicial resources and also would have unjustifiably prolonged disputes in an already highly protracted case, to the detriment of the parties' children. *See id.* (approving as "reasonable" circuit court's 50% award of fees as a way "to avoid any prolonged argument regarding costs and fees").

¶35 Eisenga's only arguments attempting to distinguish *Lane* are based on an unreasonable interpretation of the circuit court's approach here.[4] Eisenga contends that the court failed to make a finding regarding how much of the requested costs could be reasonably attributed to the sanction-worthy, contempt-caused costs,

---

[4] Neither party argues that *Lane v. Sharp Packaging Systems, Inc.*, 2002 WI 28, 251 Wis. 2d 68, 640 N.W.2d 788, is distinguishable because the ground for awarding fees in that case involved statutory sanctions for violations of discovery obligations, and we consider it to be useful authority in this context. *See id.*, ¶63 & n.25; WIS. STAT. § 804.12(1)(c)3. ("the court may apportion the reasonable expenses incurred in relation to" a motion to compel a discovery response under § 804.12(1) that is "granted in part and denied in part").

as opposed to all other costs, but we now explain why that argument misses the mark.

¶36    Taking several of the circuit court's statements out of context, Eisenga unpersuasively suggests that the circuit court's reasoning ran afoul of his interpretation of WIS. STAT. § 785.04(1)(a) to require strict "but for his contempt" causation, which to repeat we assume is correct without deciding the issue. First, Eisenga may mean to suggest that, because the circuit court noted "the overlap[ping]" and "inextricably intertwined" relationship between his motion to modify child support and Hawthorne's motion for contempt, Hawthorne will necessarily recover litigation costs that would have been incurred regardless of his contempt. But interpreting the court's statements as a whole and in context, we conclude that these references reflected the court's reasonable assessment of the practical challenges involved in precisely separating out litigation costs resulting from one or another of two closely related issues.

¶37    Similarly, it does not avail Eisenga to point to the following statement from the circuit court's order as suggesting an error in its analysis: "If Mr. Eisenga had continued to pay his child support obligation during the course of this litigation, Ms. Hawthorne would arguably not be entitled to costs and legal fees in opposing his motion to modify support." Interpreting the court's order as a whole, we conclude that the court acknowledged that Eisenga's contempt had caused Hawthorne to incur additional litigation costs and commented again on the difficulty of separating the contempt-caused litigation costs from those resulting from Eisenga's motion to modify support. Specifically, the court reasonably observed that it was Eisenga's contempt that put the court in the position of having to attempt to sort types of litigation costs, which necessarily carried at least some risk of imprecision. We note that the same risk of imprecision would have been present in

*Lane* when the circuit court awarded 50% of litigation costs related to the two motions at issue, even when there is no indication in the opinion that the motions dealt with overlapping factual issues. *See Lane*, 251 Wis. 2d 68, ¶63.[5]

¶38    Much of what may remain of Eisenga's arguments rests on details involving his color-coded submission, which he argues shows that 40% is too high of a proportion of Hawthorne's litigation costs to attribute to the contempt issue. One basic problem with his reliance on the details of the color-coded submission is that the circuit court declined to award 60% of the requested litigation costs. This leaves Eisenga the uphill task to show what portion or portions of the alleged

---

[5] Regarding the burden of proof, Eisenga argues that it was error for the circuit court to state that "once [Eisenga] stopped paying [child support] and Ms. Hawthorne filed the motion for contempt, the burden shifted to her to establish that he had the ability to" pay the ordered amounts of child support. Eisenga correctly notes that the burden of proof in a contempt proceeding is on "the person against whom the contempt is charged to show his conduct is not contemptuous." *See Besaw v. Besaw*, 89 Wis. 2d 509, 517, 279 N.W.2d 192 (1979); *see also* WIS. STAT. § 767.78(2) (circuit court shall issue order to non-paying party to show cause why party should not be subject to contempt on application of payment receiving party). However, whatever the court meant to convey in discussing the burden of proof, the ultimate question on this issue is the following: what portion of Hawthorne's litigation costs are attributable to the contempt issue based on the record before the court? Eisenga fails to explain what effect, if any, this possibly erroneous statement by the court had on the court's findings of fact on this question.

Also on the topic of the court's comments on the burden of proof, Eisenga makes confusing attempts to tie this in some manner to his prior, separate appeal of the court's denial of his motion to modify child support. *See Eisenga v. Hawthorne*, No. 2020AP1404, unpublished slip op. (WI App Dec. 23, 2021). We disregard these confusing references as undeveloped. Eisenga apparently intends to dispute reasoning in our 2021 decision, but it is sufficient to note that his petition for review of our 2021 decision was denied and accordingly it remains the law of the case. *See Eisenga v. Hawthorne*, No. 2022AP1404, unpublished slip op. (May 18, 2022); *see also State v. Stuart*, 2003 WI 73, ¶¶20, 23, 262 Wis. 2d 620, 664 N.W.2d 82 (a decision on a legal issue by an appellate court establishes the law of the case, which must be followed in subsequent court proceedings).

overinclusion were not accounted for by the court. He fails to establish any clear error that is inherent to the court's 60-40 assessment generally.[6]

¶39    Moving to the particulars of the color-coded submission, it is evident from the circuit court's reasoning that it rejected this submission as unreliable, and Eisenga fails to show that the court erred in doing so. We now address several categories of problems with the color-coded submission that support the court's decision to disregard it as unreliable.

¶40    Illustrative are billing entries that, according to Eisenga's color-coded submission, did not result from the contempt, but upon inspection the questioned entries appear to have resulted from the contempt. For example, according to the color-coded submission, an entry for "review motion for contempt," which appears to correspond to Hawthorne filing a motion for contempt based on the failure to pay child support in January 2019, should have been excluded, but Eisenga does not explain why.

¶41    Also illustrative are what the color-code submission deemed ambiguous billing entries. For example, the color-coded submission labeled many of the entries addressing correspondence and conferences by Hawthorne's attorneys with Hawthorne and others involved in the case as excludable from awardable

---

[6] In a similar vein, Eisenga misses the mark in suggesting that the circuit court intended to include in the contempt award litigation costs that Hawthorne incurred in connection with grandparent visitation issues that are clearly not related to the contempt issue. This again misreads the court's order, particularly in light of the following context. After the circuit court in January 2021 issued an order regarding an attorney-client privilege issue not pertinent to this appeal, Hawthorne submitted an amended version of billing records highlighting expenses due to litigation costs on grandparent visitation issues, conceding that they were unrelated to contempt. This resulted in a reduction of approximately $31,000 in fees requested by Hawthorne, leaving a total of $265,560.43, the starting point for the circuit court's analysis, as noted in the text above. And, to the extent this reduction of requested litigation costs missed some expenses that Hawthorne does not dispute were incurred due to non-contempt-related issues, for the reasons noted in the text Eisenga nonetheless fails to show these costs were not part of the 60%.

litigation costs on the ground that the work did not clearly result from the contempt. But Eisenga does not explain why the circuit court could not reasonably infer, especially given its vantage point as the court presiding over the proceedings, that some or all the identified entries were the result of the contempt.

¶42    Similar problems extend to the portion of the color-coded submission that purports to calculate the only awardable proportion of billing entries related to the evidentiary hearing at which the circuit court addressed both his modification motion and the contempt issue. Eisenga's calculation is based on a line-by-line interpretation of the hearing transcript to estimate the total amount of "time" spent at the hearing (as measured as a percentage of transcript lines) on issues that were exclusively devoted to the topic of his failure to pay child support, which he says yields 1%. Using this as his method, Eisenga argues that, at best, approximately 1% of Hawthorne's requested costs pertaining to the hearing itself, including the preparation for it, should be deemed the result of his contempt. Eisenga further contends that this small proportion is not surprising given that he did not contest that he failed to pay child support and that his ability to pay would have been at issue regardless of his failure to pay due to his motion to modify child support.

¶43    This approach rests on unreasonable assumptions. It is sufficient to note the following major problem. Eisenga unreasonably assumes that the circuit court was required to conclude that any work by Hawthorne's attorneys that involved Eisenga's ability to pay was necessarily the result of his modification motion and that no part of it could be attributed to a need to prove and remedy his contempt.

¶44    Regarding the interval of July through September 2020, after Eisenga ultimately paid his child support arrears, Eisenga asserts that all of the billing entries

consisted of "spurious" issues "that merely served to run up the attorneys' fees." However, Eisenga fails to provide a developed argument demonstrating that the circuit court was required to accept this characterization of any of the issues addressed in these entries.

¶45 In sum, Eisenga fails to show that the circuit court clearly erred in finding any fact or otherwise erroneously exercised its discretion in not awarding Hawthorne $5,000 in litigation costs.

*Cross Appeal*

¶46 Hawthorne makes numerous arguments in her cross appeal to the effect that the circuit court erroneously exercised its discretion in not awarding her the entire amount that she requested. We conclude that Hawthorne fails to show that the court clearly erred in finding any fact or otherwise erroneously exercised its discretion in reducing the amount she requested to exclude 60%.

¶47 Our discussion of the cross appeal does not need to be extensive, because the cross appeal largely suffers from the same basic flaws, explained above, that undermine Eisenga's challenge to the same award from the opposing direction. Like Eisenga, Hawthorne unreasonably interprets the circuit court to have failed to distinguish between the litigation costs that Hawthorne incurred based on Eisenga's motion to modify child support as opposed to the contempt issue. Also like Eisenga, Hawthorne's only attempt to distinguish *Lane* depends on an unreasonable interpretation of the circuit court's reasoning. As explained above, the record reveals how the court arrived at the figure $106,224.17: the court conducted a review of the billing records provided by Hawthorne and, relying on *Lane*, noted the extensive litigation and finite resources of the parties, leading to an approximation of the litigation costs resulting from Eisenga's contempt that neither

side has shown is an unreasonable approximation.  This is a logical rationale, based on the record before the court, and not, as Hawthorne apparently means to suggest, one in which the court "eyeballed" her request for litigation costs and "'cut it down by an arbitrary percentage because it seemed excessive to the court.'"  *See Roma II-Waterford*, 346 Wis. 2d 612, ¶26 (quoted source omitted).

¶48    In an argument analogous to one made by Eisenga, Hawthorne emphasizes that the circuit court observed "overlap" between Eisenga's motion to modify child support and her contempt motion.  As noted above, both of these motions placed at issue Eisenga's ability to pay child support.  In effect, Hawthorne mirrors Eisenga's argument, which we have rejected above, by asserting that the court was required to weigh this overlap strictly in favor of determining that Hawthorne's costs were the result of Eisenga's contempt.  However, she makes no argument rooted in the language of WIS. STAT. § 785.04(1)(a) that the court could not properly attempt to separately attribute some of her litigation costs to efforts she would have engaged in regardless of Eisenga's contempt and then exclude them on that basis.  Instead, she cites to distinguishable precedent relying on fee-shifting statutes, without developing an argument as to why they should apply in the context of remedial contempt.  *See Radford v. J.J.B. Enterprises, Ltd.*, 163 Wis. 2d 534, 550, 472 N.W.2d 790 (Ct. App. 1991) (applying analogous federal precedent to conclude that fee shifting under WIS. STAT. § 100.18(11)(b)2. does not entitle the losing party to a reduction in fees for unsuccessful claims brought in good faith, particularly when there is a "common core of facts" for all the claims of an at least partially successful plaintiff).

¶49    Further, Hawthorne fails to establish that the court clearly erred in concluding that 60% of her costs were the result of other litigation that would have occurred regardless of Eisenga's contempt.  She also fails to meaningfully respond

20

to Eisenga's point that the court did not rely on any basis other than remedial contempt sanctions to award costs. In sum, Hawthorne provides no basis for us to conclude that the court clearly erred in reaching its 60-40 approximation and not awarding her all of her requested litigation costs.[7]

¶50 Hawthorne contends that the circuit court's award failed to "make her whole," improperly leaving her in an economically worse position as a result of Eisenga's contempt. Assuming without deciding that WIS. STAT. § 785.04(1)(a)—which to repeat authorizes sanctions "sufficient to compensate … loss[es] … as the result" of contempt—strictly requires the court to make the pertinent party whole, the statute plainly limits this compensation to that which was caused by the contempt. We now explain why, if Hawthorne intends to argue that the requirement of making her whole under the circumstances here expands what is available as a sanction under § 785.04(1)(a), she fails to support the point.

¶51 Hawthorne rests her "made whole" argument on *Bernier v. Bernier*, 2006 WI App 2, ¶12, 288 Wis. 2d 743, 709 N.W.2d 453, and *Watkins v. LIRC*, 117

---

[7] In her cross-appeal reply brief, Hawthorne asserts in conclusory fashion that she would have incurred the full amount of her requested litigation costs even if Eisenga had not filed a motion to modify his child support obligation. But she fails to develop a record-supported argument that the circuit court could not reasonably make a finding to the contrary.

Separately, we note that in her respondent's brief in Eisenga's direct appeal, Hawthorne argues that the circuit court could be understood to have relied on the doctrine of overtrial in arriving at the 40% but that this should have prompted the court to award her 100% of her request. *See Zhang v. Yu*, 2001 WI App 267, ¶13, 248 Wis. 2d 913, 637 N.W.2d 754 ("Overtrial is a doctrine developed in family law cases that may be invoked when one party's unreasonable approach to litigation causes the other party to incur extra and unnecessary fees."). But, as noted in the text above, we do not understand the circuit court to have been presented with an allegation of overtrial by either side, nor do we glean from the court's reasoning a sua sponte intent to invoke that doctrine. *See id.*, ¶11 (overtrial requires finding of historic fact that excessive litigation occurred and answering the question of law of whether excessive litigation was unreasonable). Further, Hawthorne does not clearly present the concept of overtrial as a basis to reverse the circuit court in her cross-appeal briefing. *See id.*, ¶12 ("When the circuit court determines that overtrial has occurred, the decision about whether to award a contribution to attorney fees is discretionary.").

Wis. 2d 753, 345 N.W.2d 482 (1984). But neither of these opinions supports a conclusion, based on the "made whole" concept, that the circuit court here was required to award her expenses that it could find did *not* result from Eisenga's contempt. *Bernier* discussed fee shifting under the predecessor to WIS. STAT. § 767.471, addressing the enforcement of physical placement orders, and did not discuss the intertwining of awardable and non-awardable fees. *See Bernier*, 288 Wis. 2d 743, ¶¶11-12. *Bernier* does not state that making a party "whole" requires returning the party to the party's earlier position no matter the circumstances—that is, regardless of the status of all other factors, including those not related to the basis for fee shifting. *See id.*, ¶17 (successful party under predecessor statute to § 767.471 "is entitled to recover the guardian ad litem fees attributable to him or her *as part of the 'cost of maintaining an action'*" (emphasis added)); § 767.471(5)(b)1.b. As for *Watkins*, it is distinguishable in addressing the awardability of reasonable attorney fees to a prevailing wage-and-hour claimant under a fee-shifting statute, *i.e.*, circumstances that also do not involve the intertwined fees problem. In sum, Hawthorne fails to explain what bearing the "made whole" concept could have on her request for litigation costs under WIS. STAT. § 785.04, which she does not dispute allows the award for only those costs and expenses that resulted from Eisenga's contempt.

¶52 Absent a supported argument along these lines, her "made whole" argument amounts to merely stating a disagreement with the circuit court regarding the scope of the litigation costs that actually resulted from Eisenga's contempt, but

22

without showing that the court's assessment was the result of clearly erroneous fact finding or an erroneous exercise of discretion.[8]

## II. Choice Of School

¶53    Eisenga argues that the circuit court erred in granting Hawthorne's motion to modify the judgment of divorce to give her tie-breaking authority in determining the children's school. As noted above, the pertinent provision of the parties' court-adopted custody stipulation states that "[t]he children shall attend school (grades K-4 through 12) at [the school identified in the settlement], unless both parties agree that a child shall attend another school." Eisenga specifically contends that Hawthorne was required to seek relief under WIS. STAT. § 806.07 and that she is "equitably estopped," as that concept is applied by case law in the divorce context, from seeking the modification of the pertinent judgment language. In the alternative, Eisenga makes an undeveloped argument that the court lacked a sufficient factual basis to modify the school decision-making process. We provide legal standards pertinent to each of Eisenga's arguments as needed below before explaining our basis for rejecting his arguments in turn.

---

[8] On a related point, Hawthorne may intend to argue that the circuit court's award was insufficient to meet the purpose of remedial sanctions to end noncompliance with court orders, WIS. STAT. § 785.03, and to deter future noncompliance, *see* **Christensen v. Sullivan**, 2009 WI 87, ¶55, 320 Wis. 2d 76, 768 N.W.2d 798. However, as with her "made whole" argument, Hawthorne fails to show that the general purposes of remedial sanctions require the court to allow her to recover greater costs than she expended as the result of Eisenga's contempt under WIS. STAT. § 785.04(1).

Separately, we disregard a series of references that Hawthorne makes to allegations of fact that are either not in the record or that she fails to make part of a legally supported argument demonstrating that the circuit court erred in its analysis.

*Relief From Judgment Under* WIS. STAT. *§ 806.07*

¶54    Eisenga briefly argues that Hawthorne's motion to modify the judgment was essentially a nullity because it did not include a request for relief from the judgment under WIS. STAT. § 806.07.  Eisenga fails to cite any pertinent law on the applicability of § 806.07 in this context.  We note that his argument could have a starting point in case law explaining that § 806.07 is, in at least some situations, a basis to seek relief from a divorce judgment based on a stipulation of the parties. *See **Wenzel v. Wenzel***, 2017 WI App 75, ¶16, 378 Wis. 2d 670, 904 N.W.2d 384. However, Eisenga fails to offer a developed argument supported by legal authority explaining that the *only* way Hawthorne could obtain modification of a custody-related provision of the judgment was by first meeting the requirements of § 806.07, as opposed to seeking relief directly through the more specifically on-point provisions of WIS. STAT. § 767.451 that were invoked by Hawthorne.  This is sufficient reason to reject Eisenga's § 806.07 argument.  We also note that much of the reasoning below that addresses Eisenga's equitable estoppel argument further undermines his reliance on § 806.07 as a mandatory threshold, particularly in light of the terms of the court-adopted custody stipulation here.

*Equitable Estoppel*

¶55    The doctrine of equitable estoppel can preclude a party to a divorce stipulation, which has been incorporated by the circuit court into the judgment, from seeking relief from a provision contained in the stipulation.  *See **Jalovec v. Jalovec***, 2007 WI App 206, ¶11, 305 Wis. 2d 467, 739 N.W.2d 834.  If the elements of equitable estoppel are met as a matter of law, the decision to grant or deny equitable relief is within the circuit court's discretion.  ***May v. May***, 2012 WI 35, ¶14, 339 Wis. 2d 626, 813 N.W.2d 179.  The elements for equitable estoppel in this context

are that: "(1) both parties entered into the agreement freely and knowingly; (2) overall, the settlement is fair and equitable; and (3) the agreement is not illegal or violative of public policy." *Id.*, ¶36, (citing *Rintelman v. Rintelman*, 118 Wis. 2d 587, 596, 348 N.W.2d 498 (1984)). However, as we explain further below, Eisenga fails to show that the circumstances here call for applying this multi-element estoppel test, given that Hawthorne did not contest the enforceability or validity of any provision of the stipulation, but instead sought to modify it under the terms of the stipulation itself and WIS. STAT. § 767.451. *See May*, 339 Wis. 2d 626, ¶¶15-22 (discussing when child support provisions are unenforceable for violating public policy or else, in the words of one examined case, when a party questioning the validity of a stipulated term is estopped from doing so).

¶56 The circuit court rejected Eisenga's equitable estoppel argument. The court determined that "[t]he best interests of the children must supersede any agreement that was made by the parties regarding where the children attend school and which parent has the authority to make that decision." The court went on to conclude that Hawthorne had established, based on the testimony presented at the evidentiary hearing on Hawthorne's motion, that a substantial change in circumstances had taken place and that a change in schools was in the best interests of the children.

¶57 We begin our analysis by noting that the language of the parties' stipulation on custody and placement explicitly contemplates that the parties would have the ability to pursue modifications of custody or placement provisions in the circuit court. Specifically, the stipulation places two limitations on the ability to pursue modification of its provisions.

¶58     First, regarding the topic of "Dispute Settlement Procedure," the stipulation states that "[n]either parent shall seek or institute proceedings for modification of this custody and placement arrangement by litigation without first having sought and attempted to resolve their conflicts through mandatory mediation."  As noted, the parties mediated the choice of school issue, albeit unsuccessfully.  Second, the settlement also states, "In the absence of an agreement to modify the Judgment, the parties shall be bound by the provisions of WIS. STAT. §§ 767.59 and 767.451 and applicable case law with respect to any request to the Court to modify this Agreement and the Judgment of Divorce."  On its face, "applicable case law" arguably encompasses court opinions discussing and applying equitable estoppel to prevent the modification of stipulated provisions.  However, we conclude that it is not reasonable to interpret the stipulation as a whole to conclude that it reflects the parties' intentions to limit the availability of court-ordered modification to situations in which, for example, a party takes the position that a provision in question violates public policy.

¶59     Moreover, Eisenga fails to meaningfully respond to an argument by Hawthorne, based on the reasoning in *Lawrence v. Lawrence*, 2004 WI App 170, 276 Wis. 2d 403, 687 N.W.2d 748, that it was appropriate here for Hawthorne to pursue modification of the choice of school provision under WIS. STAT. § 767.451; as a result Eisenga concedes the point.  *See State v. Chu*, 2002 WI App 98, ¶53, 253 Wis. 2d 666, 643 N.W.2d 878 (failure to reply to arguments in response brief may be deemed an admission).  To explain further, Hawthorne cites our decision in *Lawrence*, which noted that the predecessor statute to § 767.451 provided a procedural mechanism to modify a custody provision regarding choice of school. *See Lawrence*, 276 Wis. 2d 403, ¶¶14, 22.  In *Lawrence*, the provision at issue was adopted by the circuit court as part of a partial settlement agreement of the parties

26

and provided that the guardian ad litem would have impasse breaking authority. *Id.*, ¶2. After the guardian ad litem broke a school-choice impasse under the provision, the losing party sought review in the circuit court without moving to modify. *Id.*, ¶¶3-4. Notably, we observed that modification under § 767.451 was available to the losing party and that this supported the conclusion that the provision in question did not violate public policy, *see id.*, ¶¶8-22, which estopped the parties from challenging the provision's validity, *see id.*, ¶6.

¶60 Eisenga does not address Hawthorne's reliance on *Lawrence* or the provisions of the custody stipulation dealing with modification. More broadly, on this issue Eisenga does not attempt to reconcile legal principles regarding equitable estoppel in this context with the overarching concern regarding the best interests of the children established in family law, as noted by the circuit court here.

*Factual Basis For Modification*

¶61 Eisenga argues that there were "no valid grounds to change the children's school or the decision-making process previously stipulated to" by the parties. We reject this argument for at least the following three reasons.

¶62 First, Eisenga does not identify, much less apply, the substantive legal standards or standards of review pertinent to a motion to modify orders regarding legal custody.

¶63 Second, Eisenga addresses only one part of the factual basis for the circuit court's granting the motion and fails to address others. Specifically, Eisenga's argument addresses only the merits of keeping the children at the school identified in the settlement as opposed to moving them to a different school, including testimony regarding considerations related to the Covid-19 pandemic. He

27

fails to address the court's findings regarding Eisenga's then-impending imprisonment based on a federal criminal conviction, which the court determined would strain the parties' already limited ability to cooperate and communicate with each other.

¶64    Third, after Hawthorne provides a developed argument on this issue, Eisenga's reply brief fails to address it, conceding the point. *See Chu*, 253 Wis. 2d 666, ¶53.

## CONCLUSION

¶65    For all of these reasons, we affirm the circuit court order granting Hawthorne a judgment awarding her a portion of the litigation costs that she requested as a partial remedial sanction for Eisenga's contempt. We also affirm the court order amending the judgment of divorce to grant Hawthorne impasse breaking authority regarding the choice of school.

*By the Court*.—Orders affirmed.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5.